CITY OF DALLAS, et al., Appellants,

v.

George C. ARNETT, et al., Appellees.

No. 05–87–01233–CV.

Court of Appeals of Texas,
Dallas.

Dec. 16, 1988.
Rehearing Denied Jan. 17, 1989.

less in amount than such benefits under the old plan. Liability for additional pension benefits was decided by the trial judge in favor of the class on its summary judgment motion. Liability for attorney fees, both against the defendants and against members of the class, was likewise decided by the trial judge, only the reasonable amount of attorney fees being determined by the jury. For reasons given below, we affirm the trial court's judgment awarding additional pension benefits to the class. We affirm the award of attorney fees against the City—but only upon condition that the class members accept a remittitur of a substantial portion of the fees awarded for appellate court handling. We reverse the trial court's judgment awarding separate attorney fees against all members of the class and remand for further proceedings on such issue consistent with this opinion.

Analeslie Muncy, Carroll R. Graham, Donna M. Atwood, Dallas, for appellants.

Marvin Menaker, Dallas, for appellees.

Before STEPHENS, STEWART, and ROWE, JJ.

ROWE, Justice.

This class action was brought by certain retired employees of the City of Dallas (the City) to recover additional benefits under the Firemen, Policemen, and Fire Alarm Operators Pension Fund (the Fund) established by the City and managed by a board of trustees (the Board). The class consisted of those retirees who had been contributing members both under the current pension plan (Plan B) and under the former pension plan (Plan A or the old plan). The City, the Fund, and the Board were named as defendants in the suit and are now appellants in this Court.

At issue is the meaning of an option provision guaranteeing that "service retirement benefits" under Plan B shall never be

## I. CONSTRUCTION OF THE PLAN

This dispute over pension benefits arises because of the dramatic increase in recent years in the monthly pay scale for patrolmen and privates in the City's police and fire departments. Benefits under the City's former pension plan, the old plan, were directly tied to fluctuations in this monthly pay scale. Benefits under the City's new pension plan, Plan B, vary according to the retiree's salary and the Consumer Price Index. When benefits under the old plan began to exceed those under Plan B, those retirees who had participated in both plans but had retired under provisions of Plan B claimed a contractual right to receive the highest benefits. In this class action, the trial court agreed with the retirees and enforced such right.

 In its first six points of error, the City complains of the trial court's construction of Plan B which resulted in an award of additional pension benefits. To properly focus on these contentions; we set forth in its entirety that section of Plan B pertaining to the computation of benefits:

## Section 6.02. Computation of Service Retirement Benefits

(a) Service retirement benefits shall be computed as follows for any member of this Pension Plan.

(1) For pension service through the first twenty years, the member shall be entitled to a base pension equal to two and one-half percent (2½%) of the average of his computation pay for the best five consecutive years (best sixty consecutive months) he was employed by either department multiplied by the number of years of pension service accrued.

(2) For the twenty-first through twenty-fifth years of pension service the member shall be entitled to a base pension equal to fifty percent (50%) of the average of his computation pay for the best five consecutive years (best sixty consecutive months) he was employed by either department for the first twenty years of pension service plus three per cent (3%) of the average of his computation pay for the best five consecutive years he was employed by either department for each of the next five years of pension service through the twenty-fifth year.

(3) For the twenty-sixth through thirty-fifth years of pension service the member shall be entitled to a base pension equal to sixty-five percent (65%) of the average of his computation pay for the best five consecutive years (best sixty consecutive months) he was employed by either department for the first twenty-five years of pension service plus one and one-half per cent (1½%) of the average of his computation pay for the best five consecutive years he was employed by either department for each of the next ten years of pension service through the thirty-fifth year.

(4) In no event shall any member receive service retirement benefits in an amount greater than eighty percent (80%) of the average of his computation pay for the best five consecutive years (best sixty consecutive months) he was employed by either department.

(5) In no event shall any member who was at any time a contributing member of the old plan or Plan A receive service retirement benefits in an amount less than the amount he would be entitled to receive if he retired under the terms of the old plan or Plan A.

The retirees base their claim to higher benefits on subsection 6.02(a)5. They contend that when the benefits available under the old plan exceed those of Plan B, they are entitled to receive benefits under the old plan. For reasons which are obvious, the City's complaints address the meaning of and the interrelationship between subsections 6.02(a)4 and 6.02(a)5. The City questions the validity of any construction which increases pension benefits above those amounts already paid because, under its reading of Plan B, members who have contributed under both Plan B and the old plan have only one opportunity to elect whether to receive benefits under the old plan or the new plan. This election must be made at retirement and is irrevocable. Alternatively, the City contends that the availability of additional benefits under the old plan must be determined cumulatively, *i.e.*, the election to take old plan benefits is not triggered until all past benefits payable under the old plan exceed all past benefits received under Plan B.

As is readily noted, subsection (a)4 imposes a *ceiling* on service retirement benefits, and subsection (a)5 imposes a *floor* on service retirement benefits. The question to be decided is to what particular "benefits" do these limitations apply.

Since none of the parties has found any ambiguity in these two subsections, we proceed to determine the applicability of these two subsections as though ambiguity were not our concern. In so doing, we apply the following well-established general rules of construction, because the naked provisions of subsections (a)4 and (a)5 do not satisfactorily answer the question at issue:

1. The terms of a particular section of the plan are not to be construed in an unduly technical sense or in isolation but are to be construed to make good sense in conjunction with all other terms of the plan.

2. That construction is to be favored which avoids conflict and gives meaning to every provision of the plan.

3. The terms of the plan are to be construed liberally in favor of the members. *See Collin [Collins] v. Board of Firemen, Policemen and Fire Alarm Operators Pension Fund Trustees of San Antonio,* 290 S.W.2d 719 (Tex.Civ.App.— Waco 1956, writ ref'd n.r.e.).

Although both subsections refer to "any member," subsection (a)4 applies broadly to those retirees whose base pension is being determined under subsections (a)1, (a)2, or (a)3, *i.e.,* those who have contributed only to Plan B. Subsection (a)5 applies restrictively to those retirees who have contributed to both Plan B and to the old plan. Thus, subsections (a)4 and (a)5 apply to discrete classes, with the result that the *ceiling* on benefits in one can function independently of the *floor* of benefits in the other. Such a result permits the floor on occasion to be above the ceiling.

Subsections 6.02(a)1–(a)3 concern the calculation of a base pension" while subsections 6.02(a)4 and (a)5 concern "service retirement benefits." Plan B contains no special definition of the term "service retirement benefits." The plan does define "base pension" as the "initial benefit rate," which in turn is computed according to the same monthly rate of pay as is used in determining the member's contribution to the pension fund. Section 6.02 which deals with the computation of pensions is not, however, entitled either "Computation of the Base Pension" or "Computation of the

Initial Benefit Rate." Rather, it is entitled "Computation of Service Retirement Benefits." Within the confines of such designated section, subsections (a)1, (a)2, and (a)3 specifically refer only to the "base pension" while the later subsections (a)4 and (a)5 specifically refer only to "service retirement benefits." This contrasting use of terms within section 6.02 suggests that the computation of "service retirement benefits" is not always identical to the computation of the "base pension" or the "initial benefit rate." Further, the plural and undefined term "service retirement benefits" appears in that first subsection to deal with collective concerns, only after the single and narrowly defined term "base pension" has been utilized exclusively in three prior subsections dealing with individual concerns. This arrangement suggests that the scope of "service retirement benefits" is potentially greater than that of either the "base pension" or the "initial base rate."

With respect to the *ceiling* described in subsection 6.02(a)4, the eighty percent "cap" on benefits cannot be made to refer broadly to pension benefits of every kind, whenever determined, without precluding any increase thereof through those annual adjustments provided for in section 6.12.[1] The provisions of both sections can be harmonized, however, by limiting the eighty percent cap to a particular variety of initial benefits, *i.e.,* those composed of the various base pensions scaled according to years of service under subsections (a)1, (a)2, and (a)3. Indeed, these are the identical base pensions to which all annual adjustments under section 6.12 particularly relate. When the cap is so applied, retirees will attain their maximum base pension after thirty-five years of service.

With respect to the *floor* described in subsection 6.02(a)5 for those members who

---

1. Section 6.12. Post–Retirement Changes in Benefits

(a) Annually, on the first day of October, the base pensions of all members and survivors receiving benefits under the provisions of this pension plan shall be adjusted to reflect cost-of-living changes. All base pensions in effect on or before September 30 of each year shall be adjusted.

(b) The base pension shall be adjusted up or down by the amount of the change in the Consumer Price Index between the months of July of the current and preceding years, or by three percent (3.000%), whichever is smaller....

have contributed to both plans, due consideration must be paid to the difference between the benefit adjustment mechanisms in each plan. Section 6.12 of Plan B provides for annual cost of living adjustments to the "base pension." Under Plan B, the "base pension" is calibrated at a monthly rate, the "computation pay" referred to in section 6.02 having been previously defined in section 2 as being a certain "monthly rate of pay." Also, by definition, the initially fixed "base pension" remains a constant figure to which the post-retirement benefits under Plan B are added.[2] The old plan, on the other hand, has no directly comparable provisions. Adjustments under the old plan are handled automatically because the "monthly pension allowance" is computed "on the basis of the current payroll" and is fixed at the maximum monthly pay scale then in effect for a patrolman or private, exclusive of educational incentive pay. Being so fixed, the pension itself under the old plan is in constant flux. Given the above differences, it appears sensible that when a comparison of benefits is at issue, the separate adjustment mechanism of each plan should be activated serially to ascertain those amounts which are subject to comparison, especially when the applicable time frame for making of comparisons is quantified by the expansive phrase "in no event." This construction parallels a suggestion inherent in the language of the section that a periodic rather than a one-time comparison is contemplated.

More important with respect to the floor is the distinction between the "initial benefit rate" and the benefit adjustment mecha-

nism. As between Plan B and the old plan, the initial benefit rate (base pension) under the former will always be the same or greater than that under the old plan.[3] Consequently, an attractive differential can be generated only by means of the benefit adjustment mechanisms. Indeed, a retiree who has contributed to both plans will never be presented with a desirable choice between alternatives unless such alternatives are calculated by monthly application of each plan's adjustment mechanism. Stated otherwise, if the determination of the initial benefit rate constitutes the only option event, a retiree who has contributed to both plans will always receive greater monthly benefits under Plan B than under the old plan, and the promised floor becomes of no consequence. To supply some functional significance to the provisions of subsection 6.02(a)5, the appropriate construction is obvious: For the purpose of testing the floor from time to time, the initial pension under the old plan as currently enhanced by that plan's adjustment mechanism must always be compared with the initial pension under Plan B as currently enhanced by that plan's adjustment mechanism.

To summarize: Unlike those benefits under subsection (a)4 which are limited to one class of members, the benefits under subsection (a)5 are of two varieties: one variety is the *same* as that as under subsection (a)4, *i.e.*, the base pension under subsections (a)1, (a)2, and (a)3 which is subject to adjustments under section 6.12; the other variety is composed entirely of those monthly benefits provided under the old plan, *i.e.*, a particular pay scale rate auto-

2. Subsection 2(k). "Base Pension" shall mean the initial benefit rate as computed under the provisions of this Plan, and shall always be the base figure used to compute any post-retirement changes in benefits.

3. Retirement benefits under Plan B commence after five years of service, calculated at an annual rate of 2.5 percent of computation pay and with the percentage rate escalating in varying increments thereafter until an 80 percent cap is reached at the thirty-fifth year. With twenty years of service under this plan, the base pen-

sion reaches 50 percent of computation pay. Under the old plan, retirement benefits commence after twenty years of service at the rate of 50 percent of a near equivalent of "computation pay," but thereafter the percentage rate never escalates. As is readily observable, the base pension under Plan B will be greater than the comparable pension under the old plan during every year except for the twentieth year anniversary, when the "base pension" will be the same under either plan.

matically subject to adjustment with any current monthly increase in that pay scale. The special members to whom subsection (a)5 applies are provided a floor measured by such monthly benefits as are available in either of these two categories.

Because of the above, and for the purpose of assuring maximum benefits for retirees through application of the subsection (a)4 ceiling as well as the subsection (a)5 floor, the full provisions of each subsection must be given distinctly differing constructions as follows:

The term "any member" in subsection (a)4 applies broadly to the class of those members presently enrolled in Plan B; the same term in subsection (a)5 applies restrictively to the separate class of those members of Plan B who were also enrolled under the old plan. For reasons of context, the term "service retirement benefits" for the class covered under subsection (a)4 applies only to that "base pension" calculable under subsections (a)1, (a)2, or (a)3 without regard to any increases subsequently afforded through annual adjustment for rises in the cost-of-living under section 6.12. For the class covered under (a)5, the term "service retirement benefits" applies disjunctively either to the monthly benefits currently receivable by retirees under Plan B or to the monthly benefits currently receivable by retirees under the old plan.

Under the above construction, the position taken by the City that subsections (a)4 and (a)5 apply only for the purpose of fixing the "initial benefit rate" for the affected members of both classes, which unique amount becomes subject to adjustment thereafter solely under the provisions of section 6.12, is too narrow. The preferred construction, as dictated by the general rules of construction, is that "service retirement benefits" in (a)4 means only those benefits which constitute the "base pension" which is subject to subsequent increases under section 6.12. "Service re-

tirement benefits" in (a)5 means each monthly pension entitlement as currently calculated. If at any time monthly benefits under the old plan exceed those under Plan B, those retirees who have been contributing members under both plans are entitled to receive the greater amount. Because monthly benefits are the standard increments to be compared when testing the floor under subsection (a)5, the City's alternative position that if additional "service retirement benefits" are awardable they must be computed on a cumulative basis, is contrary to the contractual construction approved above. Likewise, because of the contractual construction above approved, the City in all other respects is mistaken as to the scope of the alternative pension benefits afforded under Plan B. Accordingly, we overrule the City's first six points of error.

## II. ATTORNEY FEES

The class requested judgment for attorney fees under section 38.001 of the Texas Civil Practice and Remedies Code. After granting summary judgment for the class on the retirement benefits issues, the trial court found that their attorney, Marvin Menaker, was entitled to recover an attorney fee in an amount to be determined after a hearing. At the trial on the issue of attorney fees, the jury found that a reasonable fee for Menaker's services through trial was $225,000.00. The jury awarded an additional $200,000.00 in the event of appeals to this Court and the Supreme Court. The trial court entered judgment ordering the City and the Fund [4] to pay attorney fees to Menaker in accord with the jury's findings.

In addition to the award based on the jury's findings, the trial court made a further award of attorney fees by extending to the entire class a contingent fee agreement which Menaker had with some of the class members. Based on this agreement, the trial court awarded Menaker an addi-

---

**4.** Although the City, the Fund, and the Board were named as defendants in this action, the judgment ordered only the City and the Fund to

pay attorney fees. The class has not complained of the omission of the Board. Consequently, we do not address it.

tional amount which, when added to the amount of the jury findings, produced a total fee of one-third of the past due benefits awarded to *all* members of the class. This additional amount was to be deducted pro rata from the past due benefits paid each class member under the judgment.

Thus, in short, the trial court awarded Menaker a fee in an amount equal to one-third of the sum of all the awarded past due benefits. The City and the Fund were ordered to pay $425,000.00 of this amount. The class members, regardless of whether they had executed fee agreements with Menaker, were required to pay the remainder of the fee in the form of a deduction from their award. In their seventh through fifteenth points of error, appellants challenge both portions of the trial court's award of attorney fees.

### A. *Appellants' Liability for Attorney Fees under § 38.001*

In their seventh point of error, appellants contest the award of attorney fees against them. They contend that section 38.001 does not authorize an award of attorney fees against a municipality. We disagree.

■ In general, a litigant may not recover attorney fees against his adversary unless such a recovery is authorized by contract or statute. *Prudential Insurance Co. of America v. Burke*, 614 S.W.2d 847, 849–50 (Tex.Civ.App.—Texarkana), *writ ref'd n.r.e. per curiam*, 621 S.W.2d 596 (Tex.1981). In the case now before us, the class sought an award of attorney fees under section 38.001 of the Texas Civil Practice and Remedies Code. Under that section, a person may recover attorney fees from "an individual or corporation" in a suit upon a contract claim. TEX.CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 1986). The City is a municipal corporation and, thus, arguably a "corporation" within the meaning of section 38.001.

Prior to 1986, however, a number of courts of appeals held that the predecessor to section 38.001, article 2226 of the Texas Civil Statutes, did not allow an award of attorney fees against municipalities. *See, e.g., City of Austin v. North Austin State Bank*, 631 S.W.2d 564 (Tex.App.—Austin 1982, no writ). In *City of Dallas v. Watkins*, 651 S.W.2d 923, 926–27 (Tex.App.—Dallas 1983, no writ), this Court applied this rule to preclude an award of attorney fees under article 2226 to a fire fighter in a suit against the City and the Board.

*Watkins* would be dispositive of this point of error, but for the Supreme Court's decision in *Gates v. City of Dallas*, 704 S.W.2d 737 (Tex.1986). In *Gates*, the Supreme Court held that the legislature intended article 2226 to apply to municipal corporations when they were engaged in proprietary, as opposed to governmental, functions. *Id.* at 740.[5] Apparently in response to *Gates*, the legislature enacted article 1269j–13 of the Texas Civil Statutes. That article states:

A city, town, or village incorporated under state law, including a home-rule city, may not be considered a corporation under a state statute governing corporations unless the statute extends its application to a city, town, or village by express use of the term "municipal corporation," "municipality," "city," "town," or "village." It is the intent of the legislature that the limitation provided by this section apply regardless of whether the city, town, or village is acting in a governmental or proprietary function.

TEX.REV.CIV.STAT.ANN. art. 1269j–13 (Vernon Supp.1989). Thus, article 1269j–13, in effect, amended section 38.001 so that it no longer authorizes an award of attorney fees against a municipality.

Article 1269j–13 became effective June 11, 1987, after the jury's verdict in this case but before the trial court's entry of final judgment. Therefore, to determine

---

5. Because the codification of article 2226 as section 38.001 was intended to work no substantive change in the law, *Gates'* interpretation is equally applicable to section 38.001. *See* Act of June 16, 1985, ch. 959, § 10, 1985 Tex.Gen.Laws 3242, 3322.

appellants' liability for attorney fees under section 38.001, we must first determine whether article 1269j–13 is applicable to this case. If it is not, we must also determine whether section 38.001, interpreted in light of *Gates*, authorizes an award of attorney fees against appellants.

■ As a general rule, a statute is presumed to act prospectively unless it appears by fair implication from the language that the legislature intended it to be applicable to both past and future transactions. *Ex parte Abell*, 613 S.W.2d 255, 258 (Tex. 1981). In the case of a statute granting a special remedy, however, repeal or amendment of such a statute, without a savings clause for pending suits, is effective immediately. *See Knight v. International Harvester Credit Corp.*, 627 S.W.2d 382, 384 (Tex.1982); *Dickson v. Navarro County Levee Improvement District No. 3*, 135 Tex. 95, 99–100, 139 S.W.2d 257, 259 (1940). Section 38.001 is a remedial statute, *see Villiers v. Republic Financial Services, Inc.*, 602 S.W.2d 566, 572 (Tex.Civ.App.— Texarkana 1980, writ ref'd n.r.e.), and article 1269j–13 has the effect of an amendment to section 38.001, excluding municipal corporations from its operation. Therefore, absent a savings clause, article 1269j–13 precludes an award of attorney fees against appellants in this case.

■ Section 311.031(a) of the Code Construction Act, however, represents an applicable savings provision. TEX. GOV'T CODE ANN. § 311.031(a) (Vernon 1988). That section states in pertinent part:

(a) Except as provided by Subsection (b), the reenactment, revision, amendment, or repeal of a statute does not affect:

\* \* \* \* \* \*

(4) any investigation, proceeding, or remedy concerning any privilege, obligation, liability, penalty, forfeiture, or punishment; and the investigation, proceeding, or remedy may be instituted, continued, or enforced, and the penalty, forfeiture, or punishment imposed, as if the statute had not been repealed or amended.

TEX. GOV'T CODE ANN. § 311.031(a)(4) (Vernon 1988). This savings provision is applicable to codes and amendments to codes enacted as part of the state's continuing statutory revision program. TEX. GOV'T CODE ANN. §§ 311.002(1), 311.-002(2) (Vernon 1988). The Texas Civil Practice and Remedies Code is such a code. TEX.CIV.PRAC. & REM.CODE ANN. § 1.001(a) (Vernon Supp.1989). Therefore, article 1269j–13 does not prevent the class from recovering attorney fees from appellants under section 38.001 in this case. Consequently, we must determine appellants' liability under section 38.001 as interpreted by *Gates*.

■ Our analysis of appellants' liability is complicated by the fact that the trial court awarded attorney fees against not only the City, a municipal corporation, but also against the Fund. We have found nothing in the record or in the statutes governing the Fund to suggest that it is an "individual" or a "corporation." *See* TEX. REV.CIV.STAT.ANN. art. 6243a (Vernon 1970 & Supp.1989). Consequently, it is not clear that section 38.001, interpreted literally, authorizes an award of attorney fees against the Fund even if the City is found liable for them.

Nevertheless, appellants make no attempt to differentiate between the City and the Fund in their brief. Furthermore, a number of administrative and financial interconnections exist between the City and the Fund. For instance, under article 6243a of the Texas Civil Statutes, the pension board may include councilmen; the compensation for the pension administrator is determined by the city and paid out of its general fund; the city may pay for investment management and other services for the Fund; and the city treasurer acts as ex officio treasurer for the Fund and receives and transfers funds for it. TEX.REV.CIV. STAT.ANN. art. 6243a, §§ 1, 1C, 5, 5A (Vernon Supp.1989).

Furthermore, both before and after *Gates,* courts have analyzed claims against entities, such as the Fund, which are related to municipalities in terms of the same rules that are applicable to municipalities. That is, the courts have analyzed these related entities as if they were municipalities rather than attempting to determine whether the entities, considered separately, constituted corporations within the meaning of the attorney fees statute. *See, e.g., Wright v. Del E. Webb Corp.,* 786 F.2d 1275 (5th Cir.1986) (Dallas Fort–Worth Airport Board); *City of Houston v. Lyons Realty, Inc.,* 710 S.W.2d 625, 630 (Tex.App.—Houston [1st Dist.] 1986, no writ) (municipal utility district); *City of Dallas v. Watkins,* 651 S.W.2d 923, 926–27 (Tex.App.—Dallas 1983, no writ) (police and fire pension fund); *but see Housing Authority of City of Dallas v. Hubbell,* 325 S.W.2d 880 (Tex.Civ.App.—Dallas 1959, writ ref'd n.r.e.). The administrative and financial interconnections between the City and the Fund support such an approach to the case before us.

▉ Under *Gates,* a litigant bringing a suit upon a contract may recover attorney fees against a municipal corporation if it is performing a proprietary rather than a governmental function. *Gates,* 704 S.W.2d at 740. A municipality acts in a governmental role when it acts "as the agent of the State in furtherance of general law for the interest of the public at large." *Id.* at 738–39 (quoting *City of Crystal City v. Crystal City Country Club,* 486 S.W.2d 887, 889 (Tex.Civ.App.—Beaumont 1972, writ ref'd n.r.e.)). Proprietary functions, on the other hand, are discretionary functions performed by the city primarily for the benefit of those within its corporate limits. *Gates,* 704 S.W.2d at 739.

▉ It is well established that provision of police and fire protection are governmental functions. *See City of Dallas v.*

*Smith,* 130 Tex. 225, 107 S.W.2d 872, 876 (1937); *Cronen v. Nix,* 611 S.W.2d 651, 653 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.), *cert. denied,* 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 112 (1981). Appellants argue that the function involved here is the compensation of police and fire department personnel, which, they contend, is clearly a governmental function. The mere fact that the pension benefits are provided to employees who are carrying out governmental functions is not, however, sufficient to require a finding that provision of these benefits is a governmental function. *See City of Houston v. Shilling,* 150 Tex. 387, 240 S.W.2d 1010, 1013 (1951) (repair of garbage trucks, although in aid of the governmental function of garbage collection, is a proprietary activity).

▉ We have found no Texas cases which address whether operation of a police and fire fighter's pension fund is a governmental or proprietary function. In *Gates,* however, the Supreme Court held that the closely analogous function of providing health insurance to municipal employees was a proprietary function. Therefore, we conclude that the provision of pension benefits is a proprietary function and that the City and the Fund are subject to an award of attorney fees under section 38.001 in this case. Appellants' seventh point of error is overruled.[6]

### B. Award of Attorney Fees from Class Members' Recovery

In their eighth point of error, appellants assert that the trial court erred in awarding attorney fees in excess of the amount found by the jury. Appellees contend that appellants have no standing to raise this issue on appeal. Appellees point out that the additional award is deducted from the class member's recovery and has no effect on the amount of appellants' liability under the trial court judgment. Despite appel-

---

6. To the extent the right to recover attorney fees against the City may have been waived by concession of counsel upon oral submission, that portion of this opinion concerning such recovery against the City becomes academic.

lees' argument as to standing, we conclude that we may consider appellants' objections and that the trial court's award must be reversed.

■ As background to our disposition of these issues, some explanation of the common fund doctrine is required. The common fund doctrine represents an exception to the general rule that, absent a statutory or contractual basis for an award of attorney fees, each litigant must bear his own attorney fees. Under the common fund doctrine, the court, in the exercise of its equitable jurisdiction, may allow reasonable attorney fees to a complainant who at his own expense has maintained a suit which creates a fund benefitting other parties as well as himself. *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881); *Knebel v. Capital National Bank*, 518 S.W.2d 795, 799–801 (Tex.1974). The common fund doctrine is based on the principle that those receiving the benefits of the suit should bear their fair share of the expenses. *See Greenough*, 105 U.S. at 532–37; *Knebel*, 518 S.W.2d at 799 (citing *Brand v. Denson*, 81 S.W.2d 111 (Tex.Civ. App.—Austin 1935, writ dism'd w.o.j.)). The attorney fees are allowed as a charge against the fund. *Greenough*, 105 U.S. at 532–37; *Knebel*, 518 S.W.2d at 799.

The common fund doctrine originated with the case of *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881). Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds*, 87 Havr.L. Rev. 1597, 1601 (1974). In *Greenough*, the Supreme Court held that a prevailing plaintiff who had created a common fund could recover his reasonable costs of the litigation, including attorney fees. *Greenough*, 105 U.S. at 532–37. Since *Greenough*, courts have recognized a second cause of action under the common fund doctrine: that of the plaintiff's attorney to recover in his own right the reasonable value of his services to the benefitted parties. *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161, 165–66 (3rd Cir.1973); *see generally* Dawson, *supra* at 1601–12. In the instant case, Menaker filed no petition in his own name seeking attorney fees. Nevertheless, because the trial court's judgment awarded attorney fees out of the class' recovery directly to Menaker, we consider this a case in which the attorney seeks fees in his own right.

Although the common fund doctrine has been asserted infrequently in Texas cases, courts in this and other jurisdictions have recognized that an attorney may recover attorney fees from the fund created by a class action judgment or settlement. *See, e.g., Lindy Brothers*, 487 F.2d at 166; *Montalvo v. Chang*, 64 Haw. 345, 641 P.2d 1321 (1982); *Brand v. Denson*, 81 S.W.2d 111 (Tex.Civ.App.—Austin 1935, writ dism'd w.o.j.). In class actions where an attorney seeks fees from the fund, however, a potential conflict exists between the interests of the attorney and the class. *Dunn v. H.K. Porter Co., Inc.*, 602 F.2d 1105, 1109 (3rd Cir.1979); *Montalvo*, 641 P.2d at 1329 & n. 13. Consequently, many opinions addressing this situation have emphasized the trial court's obligation to protect the rights of the class and to avoid awarding "windfall" fees to attorneys. *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 216, 222–24 (2d Cir.1987); *Dunn*, 602 F.2d at 1109; *Montalvo*, 641 P.2d at 1330 & n. 15.

■ With these principles in mind, we first address appellees' argument that appellants have no standing to complain of the trial court's award of attorney fees out of the class' recovery. In the instant case, the trial court's fee award decreased the amount paid to the class. Therefore, Menaker's arguments in favor of this award advance his own interests rather than that of the class, leaving them with no representative to assert their interests. In light of the recognized judicial obligation to protect the interests of the class in situations such as this, we conclude that we can consider appellants' objections to the trial court's award.

Turning to the award itself, we first consider the trial court's award of attorney

fees out of the recoveries of those class members who did not have fee agreements with Menaker. The fees awarded from these class members were in addition to the amount that the jury found reasonable and in addition to the amount that Menaker was entitled to receive from the class members who had fee agreements with him.

 An attorney's compensation from noncontracting plaintiffs under the common fund doctrine is limited to the reasonable value of his services benefitting them. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 469–70 (2d Cir.1974); *Lindy Brothers*, 487 F.2d at 165; *Brand*, 81 S.W.2d at 112–13. Here, the jury found the reasonable value of Menaker's services to be $225,000.00 through trial plus $200,-000.00 in the event of appeals. Although the trial court, in its judgment, characterized the jury finding as "a reasonable attorney's fee to be paid to Plaintiff class by Defendants," the charge simply asked the jury to determine "a reasonable attorney's fee for the legal services rendered by Plaintiff's attorney in this case" without regard for how the fee would be paid. Consequently, by awarding Menaker fees beyond the amount found by the jury, the trial court in effect substituted its judgment for that of the jury as to a reasonable fee for Menaker's services. The trial court may not, in the absence of an appropriate motion, disregard jury findings as to reasonable attorney fees and enter judgment for a greater amount. *Williams v. Northrup*, 649 S.W.2d 740, 748 (Tex.App.—Tyler 1983, writ ref'd n.r.e.). In this case, Menaker was fully compensated for the reasonable value of his services by the trial court's judgment against appellants for the amount found by the jury. He is entitled to no additional fees from the noncontracting class members.

Next, we consider the trial court's award of attorney fees out of the recoveries of those class members who had fee agreements with Menaker. Appellants argue that this award was in error because it allowed compensation to Menaker in excess of the amount found by the jury. Although we are persuaded that a trial court under proper circumstances may enforce a contingent fee agreement which allows a recovery greater than the amount found by a jury as the reasonable value of the attorney's services, we agree that under the circumstances appearing in this record, the trial court erred in entering judgment for attorney fees in an amount in excess of the jury's findings against those class members having contingent fee agreements with Menaker.

 The trial court was not required to set aside the fee agreements between Menaker and the class members simply because they allowed Menaker a greater fee than the amount that the jury found to be the reasonable value of his services. *Dunn*, 602 F.2d at 1111–12. Nevertheless, the trial court has the authority, under appropriate circumstances, to set aside or refuse to enforce the fee agreements. *Dunn*, 602 F.2d at 1108–10; *see also Archer v. Griffith*, 390 S.W.2d 735 (Tex.1965) (affirming trial court judgment setting aside deed executed pursuant to unreasonable fee agreement entered during attorney client relationship); *Braselton v. Nicolas & Morris*, 557 S.W.2d 187, 188 (Tex.Civ. App.—Corpus Christi 1977, no writ) (fraudulent inducement). In this case, by awarding attorney fees directly to Menaker out of the class member's recovery, the trial court, in effect, enforced the fee agreements. On this issue, however, Menaker's interests were adverse to the contracting class members. *Dunn*, 602 F.2d at 1109. Although one class member testified as to the terms of the agreement, the record does not clearly show that the class members were notified of the hearing on attorney fees or its subject matter. Furthermore, the hearing involved little or no inquiry into the circumstances surrounding the execution of the fee agreements or into other factors that might affect the enforceability of the agreements. Because of the conflict of interest between the class and their attorney and the trial court's attend-

ant duty to protect the interests of the class, the court erred in ordering payment from the common fund directly to the attorney without providing class members with fair notice and an opportunity to present evidence and objections to enforcement of the agreements. *See Lindy Brothers*, 487 F.2d at 169; *Sheridan v. Police Pension Fund*, 76 A.D.2d 800, 429 N.Y.S.2d 204, 206 (N.Y.App.Div.1980); *cf.* TEX.R.CIV.P. 42(e) (all class members must receive notice of dismissal or compromise of suit). Therefore, the trial court's award of additional fees from the contracting class member's recovery must also be reversed.[7]

Appellants' eighth point of error is sustained. Appellants' ninth and tenth points of error also complain of the portion of the trial court's award of attorney fees based on the contingency fee agreements. Because of our disposition of appellants' eighth point of error, we need not address their ninth and tenth points of error.

## C. *Evidentiary Support for Attorney Fees Awarded*

Appellants' eleventh through fifteenth points of error challenge the sufficiency of the evidence to support the attorney fees awarded. As a result, our review of these points requires a summary of the evidence presented at the hearing on attorney fees.

At trial, Menaker testified that he had a contract with 126 members of the class allowing him a fee of one-third of the past due pension benefits recovered and that the contract called for no change in the amount of the fee in the event of appeal. He estimated that if the contract measure of his fee was applied against all class members, it would result in a fee of approximately $1,300,000.00. Menaker also testified that he had received a fee based on a one-third contingent fee agreement in another class action similar to this one. Me-

naker and two other attorneys testified that a contingent fee agreement such as Menaker's was fair and reasonable.

Menaker further testified that he did not keep contemporaneous time records but that he was able to document approximately 392 hours spent on the case through trial. His "best estimate" of the total amount of time spent through trial was 500 hours. Menaker estimated that an additional forty hours would be required for the legal work involved in the event of an appeal to the court of appeals and an additional sixty hours in the event of an appeal to the Supreme Court. He stated that, counting not only the legal work but also the demands of client contact, appeals through both the Court of Appeals and the Supreme Court would require a total of two hundred to three hundred hours.

In contrast to Menaker's evidence, appellants' expert testified that a contingent fee approach was not an appropriate basis for determining attorney fees in class actions. This expert testified that reasonable attorney fees in a class action were customarily determined using a lodestar method. That method involves multiplying the number of hours spent by a reasonable hourly rate to generate a lodestar or an initial fee amount. The lodestar amount may be adjusted upward or downward depending on factors such as the complexity of the case, the skill of the lawyer, the amount of recovery, and the contingent nature of the lawyer's fee. According to appellants' expert, a reasonable fee, calculated according to this method, might be $92,000.00 to $112,000.00 for Menaker's work through trial and $36,800.00 to $44,800.00 for Menaker's post trial work.

The jury found $225,000.00 to be the reasonable value of Menaker's services through trial. In addition to this amount, the jury found a total of $200,000.00 as reasonable attorney fees for Menaker's ser-

---

7. We express no opinion as to whether the contingent fee agreements in this case are enforceable either in additional proceedings in this cause or in a separate action. Furthermore, if the contingent fee agreements are found en-

forceable, we express no opinion as to whether the contracting class members may recover from the non-contracting class members, under the common fund doctrine, some portion of the fees paid.

vices through the appellate process. That total consisted of attorney fees of $100,000.00 in the event of an appeal to this Court, $50,000.00 if application is made to the Supreme Court for writ of error, and $50,000.00 if that application is granted.

In their eleventh through fourteenth points of error, appellants assert that there is no evidence to support the jury's findings as to reasonable attorney fees on appeal. Appellants also contend that these awards are grossly excessive, and they request a remittitur to $10,000.00 for an appeal to this Court, $5,000.00 for application to the Supreme Court for writ of error, and $5,000.00 if that application is granted. In their fifteenth point of error, appellants contend that the trial court's award of attorney fees of one-third of the class recovery was grossly excessive, and they request a remittitur reducing the total recovery for attorney fees to no more than $255,000.00.[8]

In reviewing appellants' contention that there is no evidence to support the jury's findings, this Court must view the evidence in the light most favorable to the findings, considering only the evidence and inferences which support the findings and rejecting any evidence or inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). In deciding whether a remittitur of actual damages is proper, this Court must apply the test for factual sufficiency of the evidence. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex.1986). That standard requires this Court to examine all of the evidence in the record to determine whether sufficient evidence supports the damage award and to suggest a remittitur only if the evidence supporting some portion of the award is so weak or the evidence to the contrary is so overwhelming that the award is manifestly wrong and unjust. *See id.; Garza*, 395 S.W.2d at 823. In determining the different question of whether an award of attorney fees is exces-

sive, however, this Court has the authority to look to the entire record in this case and to view the matter in light of the testimony, record, amount in controversy, and the Court's common knowledge as lawyers and judges. *Southland Life Insurance Co. v. Norton*, 5 S.W.2d 767, 768 (Tex.Comm'n App.1928, holding approved).

We first address appellants' contention that a remittitur limiting Menaker's total recovery of attorney fees to no more than $255,000.00 is required. We have already reversed the trial court's award of attorney fees in excess of the amount found by the jury as reasonable. Consequently, our discussion here is limited to the trial court's award of attorney fees against appellants based on the jury's verdict.

In support of their assertion that Menaker should be limited to a total fee of $255,000.00 for all his services, appellants contend that this represents a reasonable fee calculated according to the lodestar method as presented by their expert witness. Appellants contend that the lodestar method "is certainly the reasonable method and the only one applicable under current law presented in this case to determine a reasonable attorney's fee for the [class] attorney." We disagree.

The trial court's award of attorney fees against appellants was based on section 38.001 of the Texas Civil Practice and Remedies Code. That section allows an award of "reasonable attorney's fees" in a suit upon a contract. TEX.CIV.PRAC. & REM.CODE ANN. § 38.001 (Vernon 1986). Under section 38.001, testimony that a contingent fee agreement is reasonable and customary will sustain an award based on that fee agreement. *Texas General Indemnity Co. v. Speakman*, 736 S.W.2d 874, 884–86 (Tex.App.—Dallas 1987, no writ). Therefore, in this case, the testimony of Menaker and his witnesses presented legally sufficient evidence to sustain an award in an amount based on Me-

---

**8.** Appellants' brief, using an hourly rate of $352, calculates the value of Menaker's services at approximately $210,000 for trial work, $14,000 for court of appeals handling, and $21,000 for supreme court handling. The total of these services is $245,000.

naker's fee agreement. The testimony of appellants' expert merely created a fact issue as to whether a fee based on that agreement was reasonable. *Id.* at 886. The jury was not required to accept the expert's testimony or to calculate its award on the basis of the lodestar method.

The jury found the reasonable value of Menaker's services through trial to be $225,000.00. This amount is well within the range of expert testimony. Furthermore, the jury's finding as to the reasonable value of Menaker's services through trial is not so against the great weight and preponderance of the evidence as to be manifestly unjust. Nor is the jury finding excessive when viewed in light of the entire record and the amount in controversy. Therefore, no remittitur is necessary as to this amount.

■ As to the jury's award of fees for appellate work, however, the evidence presented no basis other than hours expended upon which the jury could allocate its award between pre- and post-trial services. Menaker's testimony supports a finding that, at most, Menaker's appellate work would reasonably consume three hundred hours in comparison to his best estimate of five hundred hours for his work through trial. Therefore, considering the entire record in this case, we conclude that the evidence is factually insufficient to support an award of attorney fees for appellate work in an amount greater than $135,-000.00, a figure which bears the same ratio to three hundred hours of appellate work as the jury award of $225,000.00 bears to five hundred hours of trial work. Allocating this $135,000.00 in proportion to Menaker's allocation of his time between an appeal to this Court and an appeal to the Supreme Court produces maximum awards of $54,000.00 with respect to the appeal of this Court, $40,500.00 in the event of an application for writ of error to the Supreme Court and $40,500.00 in the event that ap-

plication is granted. Appellants' twelfth, thirteenth, and fourteenth points of error are sustained to an extent consistent with this discussion. In all other respects, appellants' eleventh through fifteenth points of error are overruled.

### III. CONCLUSION

That portion of the trial court's judgment awarding additional pension benefits to the class is affirmed. The portion of the trial court's judgment awarding attorney fees out of the class recovery and directly to the class attorney is reversed and remanded. The portion of the trial court's judgment awarding attorney fees against the City is affirmed on the condition that appellees file a remittitur in the amount of $46,000.00 with respect to the appeal to this Court, $9,500.00 in the event of an application for writ of error to the Supreme Court, and $9,500.00 in the event that application is granted. The remittitur must be filed with this Court within the time prescribed for the filing of a motion for rehearing of this appeal. If no such remittitur is filed, that portion of the trial court judgment awarding attorney fees against appellants for appellate legal services provided to appellees will also be reversed and remanded to the trial court.[9]

---

**9.** Texas Rules of Appellate Procedure Rule 85 directs an appellate court to suggest a remittitur when it concludes that the trial court erred in failing to suggest a remittitur and that the cause should be reversed "for that reason only." We

recognize that our grant of a remittitur does not fall squarely within the mandate of this rule unless our holding with respect to appellants' obligation to pay damages and attorney fees to appellees can be considered separately from our

holding with respect to appellees' obligation to pay the fees of the class attorney. Because we have held that the former is solely controlled by

the jury findings while the latter is primarily controlled by extraneous factors, we conclude that a separate treatment is appropriate.