23 S.W.3d 428 (2000)
In re POLYBUTYLENE PLUMBING LITIGATION.
William and Lisa Adkins, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
George R. and Donna G. Anderson, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
Hector M. and Julia Armstrong, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
Felton K. and Jennifer J. Carpenter, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
James H. and Christa M. Clarke, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
James R. and Beverly L. Cox, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
Dan and Pearl Daniels, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
Johnnie C. and Audrey C. Dopson, et al., Appellants, *429 [VV] v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
Kenneth W. and Patsy E. Dunn, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
Green Tree at the Gardens, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
Hallene F. Johnson, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
Mark M. and Julienna McWhorter, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
Jesse G. and Alma T. Paulino, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
Ronald L. and Arah D. Phillips, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
Carl H. and Alissa A. Ray, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
Mike R. and Yvette J. Strutz, et al., Appellants,
v.
Hoechst Celanese Corporation and Shell Oil Company, Appellees.
Nos. 01-96-01528-CV, 01-98-00409-CV, 01-98-00016-CV, 01-98-00413-CV, 01-98-00124-CV, 01-98-00103-CV, 01-97-01321-CV, 01-98-00414-CV, 01-00-00289-CV, 01-00-00288-CV, 01-98-00018-CV, 01-98-00412-CV, 01-98-00415-CV, 01-98-00410-CV, 01-98-00411-CV and 01-00-00290-CV.
Court of Appeals of Texas, Houston (1st Dist.).
March 30, 2000.
Rehearing Overruled May 5, 2000.
*431 Alan B. Morrison, Washington, DC, Paul Bello, Birmingham, AL, R. Gary Stephens, Houston, amicus curiae.
George M. Fleming, George M. Bishop, Richard Warren Mithoff, Stuart J. Starry, Jerry L. Mitchell, Jr., Houston, for appellants.
Sam Johnson, Austin, Judith Hession, Hartford, CT, Gregory A. McGee, Houston, Anthony L. Cicio, Birmingham, AL, Ellen Mallow, Christopher A. Artzer, Houston, for appellees.
*432 Panel consists of Justices MIRABAL, TAFT, and NUCHIA.

OPINION
MARGARET GARNER MIRABAL, Justice.
The main issue presented in this case is whether, under Texas law as applied to these facts, a trial judge has the authority to change the terms of attorneys' fee contracts between attorneys and their clients. This is mass tort litigation, but not a class action. Appellants[1] complain about the trial court's "Final Order Approving Attorney's Fees and Expenses." We reverse.

Procedural History
We granted a joint motion to decide these 16 appeals together. These appeals arise out of lawsuits filed in district courts in 11 Texas counties.[2] They arrived in the First Court of Appeals in the following manner:
By order of October 17, 1995, all cases then pending in the district courts of Harris County, in which claims were made for damages allegedly resulting from the installation and use of polybutylene plumbing systems, were ordered consolidated for discovery and for pretrial purposes only. Judge Russell Lloyd, Judge of the 334th District Court, was appointed as the Coordinating Judge of the cases for pretrial purposes.[3] As will be discussed in detail later, a settlement was reached in most of the cases pending in Harris County and the 10 other counties, resulting in orders by Judge Lloyd in connection with the settlement of the Harris County cases. Upon joint motions, trial judges with pending polybutylene plumbing cases in Harris County and other counties adopted the orders of Judge Lloyd in their cases that were part of the settlement, resulting in final judgments. Thus, although this appeal involves 16 different cases from 11 different counties, we are reviewing the correctness of one order, by one judge, the Honorable Russell Lloyd.[4] The appeals originally filed in other courts of appeals ended up in the First Court of Appeals by order dated March 24, 1998, from the Texas Supreme Court transferring the cases to the First Court of Appeals.

The Lawsuits
The law firm of Fleming, Hovenkamp & Grayson is lead counsel with a group of 48 other law firms[5] that represented approximately *433 37,000 plaintiffs who owned in excess of 67,000 property units containing allegedly defective polybutylene plumbing systems.[6] Each of the 37,000 plaintiffs had individual fee contracts through either lead counsel Fleming, Hovenkamp & Grayson directly, or through one of the 48 other law firms involved in the litigation. The attorneys' fee contracts were negotiated on an individual basis by the parties before their suits were filed. All of the plaintiffs are adult individuals or business entities.
The lawsuits filed on behalf of the plaintiffs alleged that for many years Shell Oil Company and Hoechst Celanese Corporation provided the defective materials from which polybutylene plumbing systems were manufactured. It was alleged that, due to the defective materials supplied by Shell and Celanese, the plumbing systems failed and leaked. The polybutylene plumbing systems had been installed in many homes and businesses and had experienced massive failures.
The lawsuits sought the cost of replumbing the dwellings and buildings and cash for the water damage, inconvenience, and aggravation caused by the leaks. All of the plaintiffs participated in individual case discovery. The discovery included the completion of nearly 50,000 sets of answers to interrogatories and the taking of more than 8,000 depositions of property owners. Over 30,000 individual home inspections were performed by a plaintiffs' inspector and damage appraiser, with individual damage calculations done for each home. Expenses of over $10 million were incurred by the plaintiffs' attorneys in developing and prosecuting the cases. Three large polybutylene pipe cases, involving approximately 300 plaintiffs, actually went to trial or arbitration.
The polybutylene litigation was the dominant activity of the lead law firm, Fleming, Hovenkamp & Grayson, through nine years, involving the work of eight attorneys, five legal assistants, a number of contract attorneys, investigators, law clerks, and other support personnel with an estimated aggregate of more than 140,000 hours of time expended. George Fleming stated he spent 60% of his time during this period on the polybutylene pipe litigation, with other FH & G attorneys spending up to 90% of their time prosecuting the cases. A large operation for development and maintenance of a computer data base to manage the litigation was required because of the large number of plaintiffs involved. It is undisputed that the lead law firm used the large database and telephone banks to communicate with its clients. The lead law firm stated it had sent more than 800,000 pieces of mail to its clients in the past four years, and it had coordinated their answers to interrogatories and depositions.
The polybutylene pipe cases were undertaken by FH & G on a contingency fee basis, so that if there was no recovery there would be no fee or reimbursement of expenses.

The Settlement
The settlement agreement was finalized December 20, 1995. It was the result of years of intense negotiations culminating in over two months of nearly daily discussions. The settlement agreement was specifically "subject to the approval of" each of the involved plaintiffs, and subject to each plaintiff's "agreement to his/her individual *434 distribution as proposed by FH & G."
Under the settlement, Shell and Celanese agreed, in order to resolve all polybutylene plumbing-related claims of each of approximately 60,000 plaintiffs represented by FH & G,[7] to the following:
1. to pay $170 million cash;
2. to replumb or to reimburse replumb costs, for up to 60,000 property units (retail value of replumb: approximately $72 million).
The agreement provided that, in order to be covered, claimants "must be individually represented by FH & G," and they must "have participated in the litigation process in some manner including, but not limited to, providing claim/damage information for answering written interrogatories, having their Property Units inspected, or having their deposition taken." The cash payment of $170 million was to be distributed as follows:
(a) to reimburse FH & G for expenses incurred in prosecuting the litigation;
(b) to pay to the plaintiffs amounts sufficient to cover past polybutylene plumbing-related property damages (including personal property costs, leaks costs, insurance deductibles paid, repaired damages costs, and existing damages costs, but excluding costs of replumb and diminution of property values) plus some additional amount to be calculated in a formula to be approved by a special master.[8] To be subtracted from the amount paid per plaintiff was his/her attorneys' fees.
Attached to the settlement agreement is Exhibit "D," titled "Client Settlement Statement," to be signed by individual plaintiffs who approved the settlement agreement. The Exhibit "D" form contains language releasing Shell and Celanese from liability, and also sets out the formula for computing the net cash proceeds due the settling plaintiff, as follows:
Gross proceeds from Shell and Celanese:
Cash proceeds:
Total replumb value:
Less subrogation paid to:
Less total attorney's fee: x%[9] of cash proceeds + x% of replumb value.
Attorney's fees breakdown:
Fleming, Hovenkamp & Grayson share:
[Referring lawyer name] share:
[Participating/local lawyer name] share:
Net cash proceeds to client:
FH & G specifically represented to Shell and Celanese in the settlement agreement that the agreed-on allocation of settlement funds did not violate any agreements entered into by FH & G or referring lawyers with their clients relating to the polybutylene litigation.
Because the agreement involved the settlement of about 60,000 claims, the parties agreed to jointly petition Judge Russell Lloyd to appoint a Special Master to assist in implementing the terms of the settlement. Judge Lloyd appointed a Special Master, who filed a report approving the allocation formula for the determination of amounts due to the plaintiffs under the settlement.

The Appealed Order
When the terms of the settlement agreement came to Judge Lloyd's attention, he sua sponte set hearings on the reasonableness *435 of the attorneys' fees and expenses FH & G would be paid. As a result of the hearings, the trial judge entered an order dated November 18, 1996 that reduced the amount of expenses to be reimbursed to FH & G,[10] and reduced, by $55.7 million, the amount of attorneys' fees payable to the 49 law firms under their contingent fee contracts with clients.[11]

Discussion
In points of error one and two, FH & G asserts the trial court had no authority to modify the attorneys' fee contracts under the facts of this case.
FH & G first argues there was no case or controversy about attorneys' fees in the trial court, and without a justiciable controversy between the parties regarding the issue, the trial court order is void. In support, FH & G cites Vance v. Davidson, in which the appellate court concluded the trial court's sua sponte revision of a referral agreement between plaintiffs' trial attorney and the referring lawyer was void. 903 S.W.2d 863, 868 (Tex.App.-Houston [14th Dist.] 1995, orig. proceeding). However, the appellate court in Vance concluded the trial court's order was void because the referring attorney was not a party to the lawsuit and had never appeared and, therefore, the trial court had no jurisdiction over him to take a substantial property right away from him. Id. at 866. The present case is distinguishable from Vance because, here, the trial court had personal jurisdiction over all of the plaintiffs and over Fleming, Hovenkamp & Grayson as their attorneys. See id. at 866 n. 2 (as to an award of attorneys' fees, attorneys of record are parties to the suit). The trial court here did not change the terms of the referral agreements between the referring attorneys and Fleming, Hovenkamp & Grayson; rather, the trial court changed the terms of each fee contract signed by each individual plaintiff.
FH & G also cites Enochs v. Brown for the proposition that only parties to an attorneys' fee contract have standing to challenge the validity or interpretation of the contract and, therefore, defendants Shell and Celanese have no justiciable interests in this matter.[12] 872 S.W.2d 312, 316-17 (Tex.App.-Austin 1994, no writ). Be that as it may, the reality of this case is that defendants Shell and Celanese did not initiate the inquiry into the validity of the fee contracts. Rather, the trial judge sua sponte expressed his concerns about the attorneys' fees and invited briefing on the issue. In fact, one of the plaintiffs, Dannell Miller, who owned seven units damaged by pipe leaks, learned that the attorneys' fee issue had been raised and filed briefing in opposition to FH & G's claim. Dannell Miller also was represented by counsel at the hearing conducted by the trial judge on the attorneys' fee issue.[13] What began as a sua sponte review by the trial judge of the attorneys' fee arrangements became, at least in part, a consideration of the objections raised by a party-plaintiff to the attorneys' fees. Plaintiff Dannell Miller clearly had standing.
*436 In the trial court, there was no claim by Danell Miller, or anyone else, that the individual attorney fee agreements, viewed separately, were improper, illegal, fraudulent, excessive, or out-of-the-ordinary. There was no claim FH & G had breached a fiduciary duty, nor that any plaintiff was a minor or an incompetent who needed special protection from the court. The complaint in the trial court was that, in light of the number of plaintiffs involved in the settlement, FH & G (the 49 law firms involved) was simply getting too much money, in the aggregate. Therefore, the main issue we have to decide is whether, in light of the absence of a class action, a trial judge can properly modify otherwise perfectly legal fee contracts because the judge concludes it is not "fair" for the attorneys to receive the percentage of each recovery that was agreed upon in advance with each client.

1. The Individual Contracts
FH & G entered into contracts of employment with each of the plaintiffs whose cases are involved in this appeal. Although the contracts varied, most of them contained a provision substantially similar to the following:
The undersigned hereby assigns to and agrees to pay the said attorney [The Law Offices of Fleming, Hovenkamp & Grayson, P.C.] forty percent (40%) of the gross value of any recovery made from any party.
Under the contracts, FH & G agreed to advance the out-of-pocket costs of the litigation, to be reimbursed only upon recovery.
The statute that expressly governs contingent fee contracts is Texas Government Code section 82.065, which provides as follows:
(a) A contingent fee contract for legal services must be in writing and signed by the attorney and client.
(b) A contingent fee contract for legal services is voidable by the client if it is procured as a result of conduct violating the laws of this state or the Disciplinary Rules of the State Bar of Texas regarding barratry by attorneys or other persons.
TEX. GOV'T CODE ANN. § 82.065 (Vernon 1998). There is no allegation in this case of barratry or any violation of law that would authorize voiding the involved contingent fee contracts. The contracts comply with section 82.065.

2. General Law Regarding Attorneys' Fee Contracts
As a general rule, a court has no authority to determine what fee a litigant should pay his or her own attorney, that being a matter of contract between attorney and client. Thomas v. Anderson, 861 S.W.2d 58, 62 (Tex.App.-El Paso 1993, no writ). When the language in an attorney fee contract is plain and unambiguous, it must be enforced as written. Stern v. Wonzer, 846 S.W.2d 939, 944 (Tex.App.-Houston [1st Dist.] 1993, no writ). If an attorney fee contract was valid when made, and it was made by and between mentally competent persons, it is to be enforced without court review of the reasonableness of attorneys' fees so fixed. Parker v. Boyles, 197 S.W.2d 842, 849 (Tex.Civ.App.-Galveston 1946, writ ref'd n.r.e.).
Attorney contingency fee contracts serve two main purposes: first, they allow plaintiffs who cannot afford to pay a lawyer up-front to pay the lawyer out of any recovery and, second, such contracts, because they offer the potential of a greater fee than might be earned under an hourly billing method, compensate the attorney for the risk that the attorney will receive no fee whatsoever if the case is lost. Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex. 1997). Under contingency fee contracts, the lawyer, in effect, lends the value of legal services that are secured by a share in the client's potential recovery. Id. Under some contingency fee contracts, the *437 attorney also agrees to advance the out-of-pocket costs of the litigation; in such cases, the attorney not only risks loss of the fee, but also risks loss of actual expenditures.[14]Id.
The usual rules of contract law are applicable to contingent attorneys' fee contracts. Stern, 846 S.W.2d at 944; Howell v. Kelly, 534 S.W.2d 737, 739 (Tex. Civ.App.-Houston [1st Dist.] 1976, no writ). Courts generally will not redraft the terms of a contract. Bailey, Vaught, Robertson & Co. v. Remington Invs., Inc., 888 S.W.2d 860, 865 (Tex.App.-Dallas 1994, no writ); Thomas, 861 S.W.2d at 62; Stern, 846 S.W.2d at 944; Berman v. Rife, 644 S.W.2d 574, 576 (Tex.App.-Fort Worth 1982, writ ref'd n.r.e.); Parker, 197 S.W.2d at 849.

3. Exceptions to General Rule
We have found in Texas state court case law the following exceptions to the general rule that attorneys' fee contracts between attorneys and clients will be enforced as written if they have been fully performed by the attorneys:[15] (a) in cases involving fraud or breach of a fiduciary duty by the attorney, see Burrow v. Arce, 997 S.W.2d 229, 232 (Tex.1999); Archer v. Griffith, 390 S.W.2d 735, 740 (Tex.1964); Braselton v. Nicolas & Morris, 557 S.W.2d 187, 188 (Tex.Civ.App.-Corpus Christi 1977, no writ), and (b) in cases involving minors or incompetents. See Tex. Prob.Code Ann. § 233(b) (Vernon Supp.2000); Tex.R. Civ. P. 44; Stern, 846 S.W.2d at 947. These exceptions do not apply to the case at bar. Here, the trial court ruling was not based on any finding of fraud or breach of fiduciary duty, and no one claimed any of the plaintiffs were minors or incompetents.[16]

4. Class Actions and Common Fund Doctrine
Many of the cases relied on by appellees are class action/common fund doctrine cases; none are applicable here. As the trial court's order states, and all parties concede, this is not a class action lawsuit under Tex.R. Civ. P. 42. In this case, every plaintiff had an individual attorney fee contract with FH & G, and each plaintiff had to approve the settlement in order for it to apply to that plaintiff. There is no large group of unnamed members whose interests are represented by a named plaintiff; rather, the plaintiffs here have all filed lawsuits in their own names. Tens of thousands of interrogatories have been answered, more than 8,000 depositions have been taken, and more than 30,000 homes have been inspected.
One of the foremost objectives of Rule 42 is to protect the interests of "absent class members." General Motors Corp. v. Bloyed, 916 S.W.2d 949, 953 (Tex. 1996). Thus, under Rule 42, the trial court is charged with the responsibility of determining that any settlement is fair, adequate, and reasonable, and the trial court also determines the amount of attorneys' fees to be awarded class counsel. Id. at 958-59. In the present case, there are no "absent class members," and there is no "class counsel."
*438 Further, the "common fund doctrine" does not apply in this case. Under this doctrine, the trial court, in the exercise of its equitable jurisdiction, may award reasonable attorneys' fees to a plaintiff who, at his own expense, has maintained a suit that creates a fund benefitting other parties as well as himself. City of Dallas v. Arnett, 762 S.W.2d 942, 954 (Tex.App.-Dallas 1988, writ denied). Further, the plaintiff's attorney can recover in his or her own right the reasonable value of legal services to the benefitted parties. Id. The attorneys' fees are allowed as a charge against the fund. Id. An attorney's compensation from noncontracting plaintiffs under the common fund doctrine is limited to the reasonable value of the attorney's services benefitting them. Id. at 955.
In the present case, there are no "noncontracting plaintiffs," and FH & G is not seeking an award of attorneys' fees out of a "common fund." Rather, FH & G has a specific attorney fee contract with each plaintiff that provides for payment of attorneys' fees from each plaintiff in accordance with the particular plaintiff's personal recovery.

5. Inherent Authority
In his order, the trial judge stated that he had authority to determine the amount of attorneys' fees payable to FH & G based on "the general law relating to the authority of courts to oversee the relationship between attorneys and clients." We have already reviewed the general law in Texas regarding the sanctity of contracts, and the inability of courts to interfere with contracts except in limited circumstances. The cases cited by the trial court in its order to support its "inherent authority" position are either class action[17] or "common fund doctrine"[18] cases. As already noted, the present case is neither.
In Texas, courts do have certain "inherent" judicial powers that are derived not from legislative grant or specific constitutional provision, but from the very fact that the court has been created and charged by the constitution with certain duties and responsibilities. Eichelberger v. Eichelberger, 582 S.W.2d 395, 398 (Tex.1979). The "inherent" powers of a court are those which it may call upon to aid in the exercise of its jurisdiction, in the administration of justice, and in the preservation of its independence and integrity. Id. These powers exist to enable our courts to perform their judicial functions effectively. Id.
Examples of such "inherent" judicial powers are the power (1) to change, set aside or otherwise control judgments; (2) to summon and compel the attendance of witnesses; (3) to punish by contempt; (4) to regulate the admission and practice of law; and (5) to provide personnel to aid the court in the exercise of its judicial function. Eichelberger, 582 S.W.2d at 398 n. 1. As can be seen from the examples in Eichelberger, "inherent" judicial powers of Texas state courts do not include the authority to make substantive rulings on issues such as the enforceability or validity of contracts; the power to enforce or modify contracts through court action comes from express legislative and constitutional grants of authority.
Appellees argue that the inherent power "to regulate the admission and practice of law" bestows on judges the inherent power to examine attorneys' fee contracts for a determination of whether they are "reasonable," in order to protect clients from excessive fees. In support of this position, appellees cite a number of federal and out-of-state *439 cases that are based on codes and statutes different from Texas' codes and statutes.[19] We are not bound by federal and out-of-state case law. See Garrison Contractors, Inc. v. Liberty Mut. Ins. Co., 927 S.W.2d 296, 300 (Tex.App.-El Paso 1996), aff'd, 966 S.W.2d 482 (Tex.1998). Further, the only Texas cases cited by appellees are clearly distinguishable.[20]
Appellees have not cited one Texas state court case holding that a trial judge has the power, inherent or otherwise, to void or rewrite a fully-performed attorney fee contract in the absence of pleading and proof of barratry, fraud, breach of fiduciary duty, incapacity, illegality, class action, or the applicability of the "common fund doctrine."
We hold that, unless the parties agreed otherwise, the general rule in Texas honoring the sanctity of contracts applies in this case.

6. Did the Parties Agree Otherwise?
In his order, the trial judge also stated that he had authority to determine the amount of attorneys' fees payable to FH & G based on "provisions of the settlement agreement itself." The trial judge relied on a phrase in paragraph two[21] of the settlement agreement that provided the settlement funds would be distributed to the Eligible Claimants (plaintiffs) out of an escrow account "according to a formula developed by FH & G, approved by the Special Master, as defined herein, and approved and accepted by Eligible Claimants." The order explains as follows:
The duties of the special master are subject to the assignment and supervision of the Court and the Court is exercising its authority under Rule 171 when it involves itself in the matters placed in the purview of the special master by the settlement agreement. Tex.R. Civ. P. 171.
A court may act pursuant to consent of the litigants. Abramson v. Abramson, 788 S.W.2d 860, 863 (Tex.App.-Houston [14th Dist.] 1990, writ denied). Therefore, we must determine the extent of the "matters placed in the purview of the special master by the settlement agreement" and, thus, "within the purview of the judge."
In construing a contract, courts are to examine the entire agreement, and no one provision should be taken alone. Bryant v. Flint, 894 S.W.2d 397, 400 (Tex.App.-Houston [1st Dist.] 1994, no writ). The court must harmonize and give effect to all the provisions so that none will be rendered meaningless. Id.

Relevant Terms
The relevant portion of paragraph two of the settlement agreement reads as follows:

*440 Subject to the terms hereof, this cash payment [of $150 million] is to be distributed among Eligible Claimants representing approximately Sixty Thousand (60,000) property units as defined herein according to a formula developed by FH & G, approved by the Special Master, as defined herein, and approved and accepted by Eligible Claimants.
Paragraph four of the settlement agreement reads as follows:
4. Payments to Eligible Claimants and Attorneys. The $150 million portion of the Funds will be available for distribution ... in accordance with this Agreement and the escrow agreement(s).
With respect to the distribution of these funds, FH & G represents that it intends to distribute the funds (i) to attorneys and (ii) to Eligible Claimants in amounts sufficient to cover all past polybutylene plumbing-related property damages [with certain exclusions]... which will be based upon, among other things, claimants' previous reports of damages, inspections, and appraisal reports to the extent available, plus some additional amount, to be calculated in a formula proposed by FH & G, approved by the Special Master, and approved and accepted by the Eligible Claimants.
(Emphasis added.)
FH & G submitted to the special master a proposed formula for computing the "additional amount,"[22] and this formula was approved. The "additional amount" was the only undefined factor in the calculation described in paragraph four, as can be seen from other portions of the settlement agreement:
1. Attached to and made a part of the settlement agreement is a form "Client Settlement Statement" the client must sign if he/she accepts the settlement. The form specifies that, for attorneys' fees, "x% of cash proceeds & x% of replumb value" is to be deducted from the gross proceeds payable to the client. FH & G had different contingent fee contracts with clients, some providing for a 40% fee, others 35%, while others were more customized. Paragraph 4d of the settlement agreement states: "FH & G represents to Shell, Celanese and their attorneys that the terms of this Settlement Agreement and the allocation of the settlement funds do not violate any agreements entered into by FH & G and/or referring lawyers with their clients relating to the polybutylene litigation...."
2. In paragraph 6c, FH & G specifically represents that all Eligible Claimants have provided claim/damage information for answering written interrogatories, or have had their property units inspected, or have had their depositions taken; thus, the property damage amount in paragraph 4(ii) is a set, determinable amount. The Special Master's report specifically states that "The Eligible Claimants are reimbursed for 100% of their out of pocket past and existing property damages as determined by FH & G's damages experts." (Emphasis added.)
We note the following, additional paragraphs in the settlement agreement also refer to the special master and the "approval" role:
4. a. Payment To Eligible Claimants. Funds will be distributed by the Escrow *441 Agent to Eligible Claimants in the following manner:
(1) Funds will be allocated to Eligible Claimants according to a formula proposed by FH & G, approved by the Special Master, and approved and accepted by each Eligible Claimant....
....
(5) In the event an otherwise Eligible Claimant fails to accept the check or rejects the settlement amount, such funds shall remain in the Primary Escrow Fund for further distribution....
(6) When an accurate determination of the funds remaining to be distributed to Eligible Claimants can be made, then a second allocation will be made to other FH & G clients who are Eligible Claimants. The second allocation will be made in accordance with the original formula proposed by FH & G and approved by the Special Master and by the Eligible Claimants in the initial distribution.
4.b. Attorneys' Fee. Attorneys' Fees will be transferred by the Escrow Agent into a separate escrow account... The amount of fees transferred will be in accordance with the formula submitted by FH & G, approved by the Special Master and approved and accepted by Eligible Claimants.... Such distribution of Attorneys' Fees shall be made in accordance with the formula submitted by FH & G, approved by the Special Master, and approved and accepted by Eligible Claimants (all as set forth in paragraph 4)....
9. Recreational Vehicles. Recreational Vehicles (RV's) shall count as one property unit per RV under this Agreement.... These RV's will share in the cash payments to Eligible Claimants pursuant to a formula prepared by FH & G and approved by the Special Master as their sole relief under this Agreement....
10. Water Distribution Systems.... With regard to other community water distribution systems as described on Exhibit G, those entities will share in the cash payments to Eligible Claimants pursuant to the formula prepared by FH & G and approved by the Special Master as the sole relief under this Agreement....
20. Special Master. The parties agree to jointly petition Judge Russell Lloyd to appoint [a] Special Master to assist in implementing the terms of this settlement. The Special Master shall be compensated by FH & G for all services performed pursuant to this agreement in the total amount of $250,000 for the two-year period of this agreement, paid twice monthly in equal amounts. The Special Master represents that the compensation to be paid is a reasonable client expense for the services the Special Master is to perform in implementing this agreement. (Emphasis added.)

Construction
It is clear that the Special Master, with his/her "approval power," was provided for by the parties in the settlement agreement as a "checks and balances" measure, to help insure the settlement funds in the multiple escrow accounts were distributed to the 60,000 Eligible Claimants and their attorneys as agreed and intended by the parties involved. Throughout the agreement it is repeatedly stated that FH & G is to propose a formula for the Special Master to review. The Special Master, in the role of assisting in the implementation of the parties' agreement, is then to approve, or not approve, the proposed formula, based on whether the formula accomplishes, and is in accord with, the agreement of the parties. Nowhere is the Special Master granted the authority to independently create a formula that is to bind the parties; that is not the role the *442 parties agreed on for the Special Master, or the trial judge.

CONCLUSION
For the foregoing reasons, we sustain points of error one and two.[23] We reverse the portions of the appealed judgments dealing with the award of attorneys' fees, and we remand the cases to the respective trial courts for further proceedings.
NOTES
[1] While the "named appellants" are the persons who were plaintiffs below, the "real appellants" in interest are the attorneys for the plaintiffs. Further, while the named appellees are Hoechst Celanese Corporation and Shell Oil Co. (because they were defendants below), they are not affected by the outcome of this appeal in any way. The "true appellees" are those of the plaintiffs who have a financial interest in the outcome of this appeal (who have not settled the attorneys' fee issue and signed releases). Two such appellees/plaintiffs have filed briefs in this Court, James and Rosalee Fark and Green Valley Apartments.
[2] The suits were filed in district courts in the following counties: Brazoria, El Paso, Fort Bend, Galveston, Harris, Jefferson, Liberty, Madison, Montgomery, Nueces, and Zavala.
[3] The order did not consolidate the cases for trial, but, rather, specifically stated that "Once a trial date is set in another court, Judge Lloyd should consult with that judge before ruling on any pretrial matter that might affect that trial setting."
[4] We note that it appears 31 cases were settled by the settlement agreement; this appeal involves 16 of those cases.
[5] We will refer to the 49 law firms for the plaintiffs as "FH & G." The other 48 law firms, with offices in Texas and 12 other states, include the following: George M. Bishop & Associates; Hardy & Johns; Greer, Herz & Adams; Stephens & Stephens; Baker & Zbranek; Covington & Clifton; Gonzalez & Gonzalez; Byrd, Davis & Eisenberg; Montgomery & Associates; McCleskey, Harriger, Brazill & Graf; Tinsman & Houser; Waldman, Smallwood, Grossman & Carpenter; Corley, Moncus & Ward, P.C.; Pritchard, McCall & Jones; Burch & Cracchiolo; Blackman & Blackman; Bendelow & Darling; Schaden, Lampert & Lampert, P.C.; Icard, Merrill, Cullis, Timm, Furen & Ginsburg; Campbell & Associates; Phebus, Winkelmann, Wong & Bramfeld; Dimos, Brown, Erskine & Burkett; Sacks & Smith; Reosti, James & Sirlin, P.C.; Sacks, Weston, Smolinsky, Pearson & Albert; Harvey & Battey; and the Law Offices of the following attorneys: T. Gerald Treece; Michael O'Brien; Guy E. Hopkins; James W. Christian; Richard L. Tate; Robert Collins; Dick M. Allison; Robin Welch; Hector Zavaleta; Roger Knight, Jr.; Mitchell Damsky; Carlos Hernandez; Richard Rosenthal; Mike Carter; Paul Rothstein; Lenné E. Espenschied; Donald Mitchell; Joan Dillon; Michael A. Moynihan; Richard Holmes; and Daniel Boyce.
[6] FH & G represented additional plaintiffs around the country, but they are not a part of this litigation.
[7] As noted earlier, these 16 appeals involve approximately 37,000 of the plaintiffs, not all 60,000.
[8] The Special Master ultimately approved a formula calculating the "additional amount" that took into account the proportion of each plaintiff's replumb value, lost rents, and personal labor costs, as compared to the total of all such replumb values, lost rents, and labor costs for all eligible plaintiffs.
[9] The "x" percentage varies, depending on the attorneys' fee contract per individual plaintiff.
[10] The portion of the trial court's order reducing the amount of reimbursable expenses is not before us for review on appeal.
[11] Most of FH & G's contracts provide for a 40% contingent fee. Judge Lloyd reduced the contingent fee to 20% for the cases that did not go to trial, and excluded any contingent fee on the $72 million value of the replumbs. FH & G (49 law firms) claimed entitlement, under the express terms of the contingent fee contracts with their clients, to a total of $88.8 million in attorneys' fees; Judge Lloyd reduced the attorney fee amount to $33.1 million (a $55.7 million reduction).
[12] As previously noted, the liability of Shell and Celanese is not affected by the ruling on the attorneys' fee issue. Under the settlement agreement, Shell and Celanese agreed to pay a definite, lump sum amount; how the cash settlement amount is distributed as among FH & G and plaintiffs will not increase or lower the payment obligation of Shell and Celanese.
[13] Dannell Miller has since settled with FH & G and is, therefore, not an appellee on appeal.
[14] As noted earlier, the contracts involved in the present case are typical contingency fee contracts in which the attorneys also agree to advance the out-of-pocket costs of litigation.
[15] There is no claim that FH & G has breached the attorneys' fee contracts by non-performance or that the contracts are ambiguous in any way. FH & G has fully performed and is seeking payment according to the clear terms agreed upon. We note that the "general rule" presupposes the attorneys' fee contracts are not illegal contracts; there was no claim of illegality here.
[16] We note that appellees cite a number of cases dealing with the trial court's authority to review the reasonableness of attorneys' fees when the fees are to be assessed against the defendant pursuant to a fee-shifting statute that places the burden to pay attorneys' fees on the losing party. None of those cases are applicable here; the trial court was not reviewing the reasonableness of attorneys' fees "awarded against" a losing party, but, rather, was construing contractual obligations between attorneys and their own clients.
[17] Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 715 (5th Cir.1974); In re Joint E. and S. Dists. Asbestos Litig., 878 F.Supp. 473, 558-59 (E.D.N.Y.1995); General Motors Corp. v. Bloyed, 916 S.W.2d 949, 952 (Tex. 1996).
[18] In re Air Crash Disaster at Florida Everglades on December 29, 1972, 549 F.2d 1006, 1012 (5th Cir.1977)
[19] For example, many of the federal cases cited by appellees rely on the American Bar Association Canons of Professional Ethics, which differ significantly from the Texas Disciplinary Rules of Professional Conduct. We note that there was no allegation in the present case that the involved contingent fee arrangement was illegal or unconscionable, as defined in the Texas disciplinary rules. See Tex. Disciplinary R. Prof'l Conduct 1.04, reprinted in Tex. Gov't Code Ann., tit. 2, subtit. G. app. (Vernon 1998) (Tex. State Bar R. art. X, § 9).
[20] City of Dallas v. Arnett, 762 S.W.2d 942, 955 (Tex.App.-Dallas 1988, writ denied) (class action and common fund doctrine case); Quintero v. Jim Walter Homes, Inc., 709 S.W.2d 225, 229 (Tex.App.-Corpus Christi 1985, writ ref'd n.r.e.) (suit to set aside release and settlement agreement due to lack of informed consent); Dodd v. Harper, 670 S.W.2d 646, 650 (Tex.App.-Houston [1st Dist.] 1983, no writ) (suit against decedent's estateno claim regarding attorney); Braselton v. Nicolas & Morris, 557 S.W.2d 187, 188 (Tex.Civ.App.-Corpus Christi 1977, no writ) (fraud); Archer v. Griffith, 390 S.W.2d 735, 742 (Tex.1964) (constructive fraud); Woolsey v. Panhandle Refining Co., 131 Tex. 449, 116 S.W.2d 675, 678 (1938) (violation of worker's compensation law).
[21] The order cites paragraph three of the settlement agreement as the source of the phrase; however, the trial court obviously meant to reference paragraph two, which contains such phrase, rather than paragraph three, which does not contain the phrase.
[22] The formula proposed and approved for the "additional amount is:"
Eligible Claimant's
Retail Replumb
Costs, Labor Costs Remaining = Dollar
& Lost Rents × Funds Allocation
All Eligible
Claimants' Retail
Replumb Costs,
Labor Costs
& Lost Rents

[23] In light of our sustaining points of error one and two, it is not necessary for us to reach the merits of point of error three (retroactivity) or point of error four (evidence), and we decline to do so.