**Fred A. SHAMBLIN, et al.**

v.

**Joshua D. SYLVESTER.**

Court of Appeals of Tennessee,
Eastern Section, at Knoxville.

Feb. 9, 2009 Session.

April 13, 2009.

Permission to Appeal Denied by
Supreme Court Nov. 23, 2009.

H. Chris Trew, Athens, Tennessee, for the Appellant, Rosanna Vestal.

Joseph H. Crabtree, Jr., Sweetwater, Tennessee, for the Appellee, Fred A. Shamblin.

Bridget J. Willhite, Athens, Tennessee, for the Appellee Joshua Sylvester.

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

On November 13, 2007, Amanda Shamblin died as a result of injuries received in an automobile accident while riding as a passenger in a vehicle being driven by Joshua Sylvester ("Defendant"). The decedent's father, Fred A. Shamblin ("Father") retained attorney Joseph H. Crabtree, Jr., ("Crabtree") and immediately filed suit against Defendant. After the case settled for the insurance policy limits of $300,000.00, the decedent's mother, Rosanna Vestal ("Mother"), who had not participated or otherwise been active in the settling of this lawsuit, objected to paying any attorney fees out of the one-half share of the settlement proceeds she was entitled to under the wrongful death statutes. Following a hearing, the Trial Court determined that the settlement proceeds constituted a common fund and Mother was a passive beneficiary of that fund, and, therefore, she was obligated to pay a reasonable attorney fee to Crabtree. The Trial Court then determined that a reasonable fee was one-third of the settlement proceeds. Mother appeals, and we affirm.

### Background

This appeal has its origins in a wrongful death lawsuit filed on November 28, 2007, by Father, individually and as next of kin of his daughter, the decedent, Amanda Shamblin. Just two weeks before the lawsuit was filed, the decedent died as a result of injuries received in an automobile accident which occurred on November 13, 2007. The decedent was a passenger in an automobile being driven by Defendant. In the complaint, Father alleged that Defendant was driving negligently and recklessly, which proximately caused the death of his daughter. Father was represented by attorney Crabtree. Father and Crabtree had entered into a contingency fee arrangement whereby Crabtree would receive one-third (1/3) of any recovery.

Defendant responded to the complaint and admitted that the accident occurred and that the decedent died as a result of the accident. Defendant denied that the decedent's death was the result of his negligence of recklessness.

Mother did not participate either in the lawsuit filed by Father or the settlement

of this lawsuit. This case settled quickly with two insurance companies paying policy limits which, when combined, totaled $300,000. After receiving the settlement proceeds, Crabtree sought a one-third fee of the entire recovery, including Mother's portion. Mother refused to pay Crabtree one-third of her share of the proceeds. In March of 2008, Mr. Shamblin filed a Motion to Approve Attorney Fee. In relevant part, this motion states:

The Plaintiff is the father of the Decedent, Amanda Shamblin. Rosanna Vestal is the Decedent's mother. The Plaintiff and Mrs. Vestal were divorced many years ago when the Decedent was [a] young child. The Decedent died, at the age of eighteen, on November 13, 2007 in an automobile accident while a passenger in a vehicle operated by the Defendant, Joshua D. Sylvester. This case is a wrongful death action brought by Fred A. Shamblin in his capacity as a surviving parent and wrongful death beneficiary. This action is brought on his behalf as well as the other statutory wrongful death beneficiary, Rosanna Vestal.

On November 27, 2007, Plaintiff retained the services of Joseph Crabtree, Jr. to pursue a wrongful death action against Joshua D. Sylvester, and to recover any uninsured motorist coverages or proceeds which might be available. Attached as Exhibit # 1 is a copy of the Retainer Agreement between Plaintiff and counsel.

On November 28, [2007], this action was commenced by filing a Complaint for Wrongful Death. . . .

Soon thereafter, counsel was contacted by Attorney Bridget Willhite advising that she would be representing the interests of Joshua D. Sylvester. A formal appearance was made on January 3, 2008 and an Answer was filed on January 15, 2008 on behalf of Mr. Sylvester. . . .

As early as January 3, 2008, State Farm indicated that it wished to tender its limits of coverage on behalf of Defendant . . ., subject to resolution regarding the disbursement of the settlement proceeds between Plaintiff and Mrs. Vestal. . . .

On February 5, 2008, Attorney Bridget Willhite sent formal notification to Travelers Insurance of the tender of State Farm's limits and requested waiver of subrogation, pursuant to Tennessee Code Annotated § 56–7–1206(g). . . . [1]

On February 7, 2008, Travelers Insurance, as uninsured motorist carrier, agreed to waive subrogation against Joshua D. Sylvester, in exchange for State Farm's tender of its limits of liability insurance coverage on his behalf.

By letter dated February 7, 2008, Travelers forwarded to Plaintiff's counsel a check . . . made payable to Plaintiff, Rosanna Vestal and Plaintiff's counsel, together with a Release to be executed by Plaintiff and Rosanna Vestal. . . .

On February 25, 2008, the State Farm proceeds arrived at Attorney Willhite's office pending execution of the Release and Order of Dismissal. . . .

On February 22, 2008, Plaintiff's counsel forwarded to counsel for Mrs. Vestal, the two Releases executed by Plaintiff and requesting Mrs. Vestal to execute same and to arrange a time to conclude

---

1. State Farm Mutual Automobile Insurance Company's policy limits were $50,000, and Travelers Indemnity Company's policy limits were $250,000. Thus, the maximum amount of available insurance was $300,000.

the settlement and the disbursement of the settlement proceeds.

Mrs. Vestal objects to the payment of attorney fees to Plaintiff's counsel out of her portion of the settlement proceeds.

Plaintiff and Mrs. Vestal have each received $100,000.00 of the settlement proceeds. The remaining $100,000.00 is being held by counsel for Plaintiff in his escrow account by agreement of the parties subject to this Court's ruling on this Motion .... (original paragraph numbering omitted)

In support of his application for attorney fees, Crabtree filed the affidavit of attorney John Cleveland ("Cleveland"), who practices law in Monroe County and has practiced law since 1977. Cleveland, a former Juvenile Court Judge, is in private practice and also serves as a Special Judge for the Juvenile Court. According to Cleveland:

I am familiar with the range of customary charges made by litigators for trial of cases in East Tennessee generally and in the Tenth Judicial District specifically. I am also familiar with awards for attorneys' fees which have been made in the Tenth Judicial District and the surrounding area.

I have reviewed the substantive and procedural facts in this case and the qualifications of Joseph H. Crabtree, Jr. Mr. Crabtree acted promptly and diligently in filing suit, determining the amounts of available insurance coverage and securing payment of the available policy limits within ninety days after being retained. Based upon the foregoing experience and knowledge, it is my opinion that in litigation such as this, it would be not only reasonable but customary for a well-qualified attorney with twenty-two years experience, such as Mr. Crabtree, to charge Two Hundred Dollars ($200) per hour for legal services. However,

unless the prospective plaintiff was able to pay a substantial retainer in advance and pay all fees and costs in excess of the retainer promptly within thirty days after those fees and costs were incurred, I would not take this case except for a contingency fee of at least one-third. Such contingency fees are customary in this judicial district. It has been my experience that paying a substantial retainer in advance and pay[ing] all fees and costs in excess of the retainer promptly within thirty days after those fees and costs were incurred is well beyond the means of most potential plaintiffs in this judicial district. If attorneys did not customarily take cases such as this on a contingency fee agreement, then legal services, access to our judicial system and the opportunity to recover any award of damages for personal injury at all would be unavailable to such potential plaintiffs. (original paragraph numbering omitted)

Crabtree also filed the affidavit of attorney Holt Smith ("Smith"), who practices law in Monroe County and who has been practicing law for over thirty years. According to Smith:

It is common practice in this district, and all other districts, for attorneys to charge a contingent fee in a personal injury case. The usual and customary fee is one-third. I am a very strong supporter of the contingency fee since it provides access to judicial systems by persons who otherwise would not be able to afford representation.

I have reviewed the Motion to Approved (sic) Attorney Fee filed by Mr. Crabtree, the Retainer Agreement, and the Exhibits attached to the Motion including the Affidavit of Joseph Crabtree, Jr. In addition, I have reviewed Rule 8, R.P.C. 1.5 which is concerned with fees lawyers charge. In addition, I have ...

considered reasonableness of the fee in filing this affidavit. Having reviewed the Affidavit of Mr. Crabtree I can state of my own personal knowledge that I am familiar with Mr. Crabtree as an attorney, and believe he is a very competent attorney in personal injury matters. I have dealt with Mr. Crabtree on several cases and find that he is very knowledgeable of the area of law concerning personal injury and understands the appropriate issues.

After Mr. Crabtree met with his client, Mr. Fred Shamblin, the case was handled in a professional manner. The contingent fee contract is an extremely well drafted contingent fee contract and sets forth the client's and the attorney's responsibilities. At the time of accepting employment, Mr. Crabtree was not aware of the limits of liability coverage or the uninsured motorist insurance coverage available. Mr. Crabtree appropriately filed suit and had the Summons served on the appropriate parties. According to his Affidavit he contacted the appropriate parties and was able to arrive at a policy limits settlement. In addition, Mr. Crabtree was able to negotiate a waiver of a subrogation interest for Travelers Insurance Company which benefited (sic) both Mr. Shamblin and Ms. Vestal.

In reviewing Mr. Crabtree's Affidavit, I agree that a contingency fee in a case such as this is customary. At the beginning of most cases the extent of available insurance coverage is not known. I am all too familiar with the fact that many times cases result in litigation and jury trials without a positive result for the plaintiffs, and the attorney receives no compensation for an extraordinary amount of work. Furthermore, most attorneys advance expenses for the client, and in many cases the expenses have to be absorbed by plaintiff's counsel.

In my opinion Mr. Crabtree did a diligent job in creating a common fund. It was appropriate to file suit under the facts and circumstances to facilitate prompt payment of the policy limits. . . .

In my opinion a one-third contingent fee would be within the range of reasonableness for this particular case. Although, such a fee might appear to be excessive, in the context of personal injury litigation area, a one-third fee is justified . . . . (original paragraph numbering omitted)

Mother responded to the affidavits filed by Crabtree and filed affidavits of her own, including the affidavit of Roger W. Dickson ("Dickson"), who has practiced law in Hamilton County since 1971, except from 1979 through 1984 when he was a magistrate for the Eastern District of Tennessee. Dickson described the usual procedure he goes through when initially meeting with a prospective client and evaluating a personal injury or wrongful death claim. Dickson then added:

I am familiar with a recent wrongful death claim arising from an automobile accident in which our firm had some involvement. From information gathered from the client and other sources, it was apparent from the beginning that the insurance company involved would more than likely consider the circumstances a case of liability for the insured and pay policy limits upon notice from a claimant. The matter was resolved within a short time with the insurance company paying the policy limits. Our firm charged by the hour, minimal fees.

I am familiar with the circumstances resulting in the death of Amanda Shamblin in an automobile wreck which occurred November 17, 2007. I have reviewed the report of the police officer who investigated the wreck, a copy of

which is attached to this Affidavit. The report indicates that Joshua Sylvester was operating a vehicle in the early morning hours of November 13, 2007 and the vehicle left the roadway and ultimately flipped upside down. The report indicates that Amanda Shamblin was riding as a passenger in the vehicle operated by Joshua Sylvester, and she died as a result of the injuries received in the wreck. The report states that Joshua Sylvester informed the investigating officer that he must have looked down at his cell phone and went off the road and could not correct the vehicle and wrecked. The report indicates that Joshua Sylvester was 18 years of age at the time of the wreck.

I have reviewed the Affidavit of Kevin Milligan, the Claims Adjuster for State Farm Mutual Automobile Insurance Company. State Farm insured the Sylvester vehicle. I have reviewed the Affidavit of Keith Reilly, the Claims Adjuster for Travelers Indemnity Company. Travelers Indemnity Company had issued a policy of insurance with uninsured motorist coverage available to Amanda Shamblin.

I have reviewed the Motion of Attorney Joe Crabtree for Attorney Fees. In his Motion Attorney Crabtree states that between State Farm and Travelers the amount of $300,000.00 has been paid for the wrongful death of Amanda Shamblin, and he desires a fee of one-third (1/3) of this recovery or $100,000.00.

Based upon my review of all of the above, Amanda Shamblin died in an automobile crash November 13, 2007. During the month of November 2007, the mother of Amanda Shamblin, Rosanna Vestal, had communicated with the adjusters for State Farm and Travelers. During November 2007 the Claims Adjusters for State Farm and Travelers had reviewed the report of the investi-

gating officer discussed earlier in my Affidavit. In addition, the State Farm adjuster had discussed the crash with Joshua Sylvester.

It is my sincere belief and opinion that if I had consulted with Rosanna Vestal concerning the wrongful death of her daughter, Amanda Shamblin, during November 2007, and reviewed the report of the investigating police officer, and learned that Ms. Vestal had been in contact with the Claims Adjusters for Travelers and State Farm, I would have informed her that more than likely both insurance companies would voluntarily pay their respective policy limits to her and the father of Amanda Shamblin within a reasonable amount of time following a request for payment and without the necessity of retaining an attorney or filing a lawsuit. I would have recommended to Ms. Vestal that she seek the payment of policy limits from State Farm and Travelers on her own to avoid the expense associated with hiring an attorney. I certainly would have recommended that she not engage an attorney on a contingency fee basis considering the circumstances of her daughter's death. I would have informed Ms. Vestal that if she desired I would review for her any legal documents presented by the insurance companies on an hourly fee basis. I would have followed this same practice if consulted by Mr. Shamblin.

With due respect to Attorney Crabtree, it is my opinion that the payment of a one-third (1/3) contingency fee from the $300,000.00 paid by State Farm and Travelers is not a fair, just, or reasonable fee as is provided for and required by the Tennessee Supreme Court's *Rules of Professional Conduct,* Rule 1.5. Based upon the specific factors incorporated in Rule 1.5, the fee claimed cannot

be justified as reasonable. It is further my opinion that the payment of a one-third (1/3) contingency fee in this case is not a customary or usual fee that would be charged by an attorney in the East Tennessee legal community. The basis of these opinions is reference to the Tennessee Supreme Court's *Rules of Professional Conduct* and my knowledge that a reasonable attorney would recognize that based upon the circumstances of the crash involving Mr. Sylvester and Ms. Shamblin, that both State Farm and Travelers would voluntarily pay policy limits, assuming the total policy limits are $300,000.00 or less, which information would have been easily available. With due respect to Attorney Crabtree, it is my opinion that a reasonable resolution of the attorney fee dispute in this matter would be that . . . Ms. Vestal pay her attorney [fees based on the guidelines set out in the Tennessee Supreme Court's *Rules of Professional Conduct,* Rule 1.5]. In my opinion, the guidelines provide that a reasonable fee for both parties should be based on an hourly rate.

In addition to the affidavit of Dickson, Mother also filed the affidavit of Tony Farmer ("Farmer"), who has practiced law since 1975 and represents plaintiffs exclusively. Farmer's affidavit was essentially identical to Dickson's with respect to whether the fee Crabtree sought to charge Mother was reasonable under the facts of this case. However, Farmer characterized the fee sought to be charged by Crabtree as "clearly excessive" and likewise conclud-ed that a reasonable fee for Mother to pay would be based upon an hourly rate.

A hearing was conducted in May 2008. At the hearing, Crabtree argued that one reason he pushed for a quick policy limits settlement was because drug and alcohol tests had been performed on the decedent and Defendant and he wanted to get the case settled before those test results came back. According to Crabtree, "there could be significant and serious questions as to the value of the case and whether there could be any recovery at all," depending on the results of the tests.[2] Following the hearing, the Trial Court announced its decision from the bench. According to the Trial Court:

> Well, I think you both outlined the case very well and I have ample evidence in the record for . . . the Court to base the findings of fact. There is no doubt in my mind that this is a common fund case under the Kline case . . . that would apply. And the . . . difficulty here is the assessment of attorney fees against the non-contracting party which then gets over into reasonableness of the fee and which really requires that I set a fee commensurate with the—a reasonable fee with the actual benefits conferred on the non-contracting party as opposed to actually the contracting party. . . . [Father] had a right to bring this action. From his standpoint, certainly speaking with an attorney to advocate and make the position favorable for him put him in the best position as far as whatever his legal rights were concerned. It was totally appropriate for him to obtain an

---

**2.** According to test results contained in the record on appeal, the decedent tested positive for Oxycodone and Paroxetine. Defendant tested positive for Xanax and Oxycodone. While this appeal was pending, Crabtree filed a motion to consider post-judgment facts. More specifically, Crabtree asks this Court to consider Defendant's guilty plea to vehicular homicide arising from the death of the decedent. The guilty plea was entered into on August 11, 2008. Since the issue of whether Defendant was guilty of vehicular homicide did not impact the Trial Court's decision, the motion to consider post-judgment facts is denied.

attorney, enter into an agreement on a fee and to pursue the cause of action. That doesn't answer all the questions I have to deal with, but it does factor in to attorney fees because of the factor of the time limitation imposed by the client or by the circumstances. So in this case the circumstances dictated in my view ... [that a] reasonable action on behalf of Mr. Crabtree was to file suit in this case....

[M]y view of trying cases here ... is that generally all of our jurors in this district are conservative where it comes to dollars and the value on claims of personal injury and even wrongful death....

[With regard to the factor addressing time devoted to performing the legal services,] there was significant time but not as much [as there could have been] because of the settlement.... [Although this case was not novel or particularly difficult, there was a] skilled requisite to perform the legal services properly, certainly you need to have the experience that Mr. Crabtree does possess to do this, and he did possess it, does have it.

The Trial Court then discussed the various and competing affidavits which addressed, among other things, whether a one-third fee would be reasonable. After so doing, the Trial Court specifically stated that it was going to credit the testimony of attorneys Smith and Cleveland "as to their opinions as to what is customary in this locality as to charging contingent fees under circumstances such as these, and I do credit their testimony." The Trial Court then continued as follows:

I think that in this case as in many cases ... you have a lot of factors you consider under the circumstances, they give you ... five factors. Many times there are one or two factors that are most significant to the Court. Obviously just the contract for a fee in this case does not have very much weight because of the fact that we're dealing with a non-contracting party ... I don't count that [as carrying] much weight. But what does carry a great deal of weight in this case are the amount involved and the results obtained in this case. Coupled with the guidelines of the Kline case, it says I'm to consider the benefit to the non-contracting party. That's significant to me in this case, very significant.... The nature and length of the professional relationship with the client, here we're dealing with a non-contracting party so there was no relationship. The experience, reputation and ability of the lawyer or lawyers performing the services is quite good, quite first rate....

When I look at all those factors, I'm convinced that there are some details in this case that could have caused it to go off track if it hadn't been promptly dealt with. The issue of subsequent drug test results coming back could have affected the settlement of this case ... had this not been one that was settled promptly. I don't credit testimony to the fact that these companies were ready to pay their coverage at some point early on.... An attorney's statement they'll recommend such and such is nothing more than that, it's not an offer. The tender was made when the tender was made under the record.... It was under the circumstances made at a time that was in my view maximized the benefit to both parties before the Court today, Mr. Shamblin and also Ms. Vestal. It maximized their recovery in this case to the extent of the coverage available, and that was a great benefit to Ms. Vestal. Another benefit to Ms. Vestal was the avoidance of a trial on the merits of this case which could have easily ... spiraled down upon the determination of those facts

[regarding the drug tests] having been brought to light. . . .

[A]s I look at the settlement today, I can say that the promptness of Mr. Crabtree in the case had to in my view be considered as a great benefit to Ms. [Vestal], therefore I'm going to sustain the one-third contingency fee in this case. I believe that those two factors are of great benefit to parents that lost a child, one, the maximum recovery under the facts of the case, avoidance of a creation of an issue that could have caused the case to go a completely different direction, and the avoidance of a trial is a great benefit in my view in this case as I see the facts of this case and the attorney fees for this case.

Mother appeals raising two issues. First, she claims that the Trial Court erred when it applied the common fund doctrine to the settlement proceeds in this case. Second, Mother claims that the Trial Court erred when it determined that Crabtree was entitled to a one-third (1/3) fee from her share of the settlement proceeds.[3]

### Discussion

The standard of review for both of Mother's issues is set forth in *Kline v. Eyrich,* 69 S.W.3d 197 (Tenn.2002), wherein our Supreme Court stated:

Any issue as to whether the common fund doctrine applies to spread an attorney's fee among various parties is a question of law. *See Kindred v. City of Omaha Employees' Ret. Sys.,* 252 Neb. 658, 564 N.W.2d 592, 595 (1997). Accordingly, our standard of review on this issue is *de novo,* according no presumption of correctness to the trial court's conclusions of law. *See, e.g., Doyle v.*

*Frost,* 49 S.W.3d 853, 856 (Tenn.2001). However, upon finding that the common fund doctrine is applicable, "[t]he allowance of attorney's fees is [then] largely in the discretion of the trial court." *Cf. Aaron v. Aaron,* 909 S.W.2d 408, 411 (Tenn.1995). Consequently, we will uphold a trial court's award of fees unless it has abused its discretion, *see Fell v. Rambo,* 36 S.W.3d 837, 853 (Tenn.Ct. App.2000), meaning that it either applied an incorrect legal standard or reached a clearly unreasonable decision, thereby causing an injustice to the aggrieved party, *see Clinard v. Blackwood,* 46 S.W.3d 177, 182 (Tenn.2001) (citing *State v. Shirley,* 6 S.W.3d 243, 247 (Tenn. 1999)).

*Kline,* 69 S.W.3d at 203–04.

We first will discuss whether the Trial Court erred when if applied the common fund doctrine in this case. A thorough discussion of this doctrine also is found in *Kline,* wherein our Supreme Court discussed both the common fund doctrine in general as well as its application to a wrongful death case. The Supreme Court stated as follows, with all footnotes being in the original:

In the absence of a statute or contract providing for the payment of attorneys' fees, attorneys in Tennessee must generally look only to their own client for their fees. *See Remco Equip. Sales, Inc. v. Manz,* 952 S.W.2d 437, 439 (Tenn. Ct.App.1997). This principle usually follows even when the work of the attorney proves useful to persons other than the client. *See Boston, Bates & Holt v. Tennessee Farmers Mut. Ins. Co.,* 857 S.W.2d 32, 34–35 (Tenn.1993). However, an exception to this rule arises when

---

**3.** On appeal, Appellee Joshua Sylvester, by and through his attorney, Bridget J. Willhite, filed a brief informing this Court that Mr. Sylvester was taking no position on the attorney fee issue.

the attorney "has succeeded in securing, augmenting, or preserving property or a fund of money in which other people are entitled to share in common." *Travelers Ins. Co. v. Williams*, 541 S.W.2d 587, 589–90 (Tenn.1976). In such a case, the attorney may oblige the beneficiaries of the fund or property to contribute to his or her fee by assessing that fee directly against the fund or property itself. *See id.*

Known as the "common fund doctrine," this doctrine is designed to spread attorneys' fees among various beneficiaries to a fund, and it is supported by two primary rationales. First, the doctrine prevents the beneficiaries of legal services from being unjustly enriched by requiring them to pay for those services according to the benefit received. *See Pennington v. Divney*, 182 Tenn. 207, 211–12, 185 S.W.2d 514, 516 (1945). Second, the doctrine serves to spread the costs of litigation proportionally among all of the beneficiaries so that the plaintiff does not bear the entire burden alone. *See Hobson v. First State Bank*, 801 S.W.2d 807, 809 (Tenn. Ct.App.1990) (citation omitted). Indeed, in furtherance of this latter rationale, the doctrine may be applied irrespective of whether the other beneficiaries to the common fund actually receive the benefits of the common fund. *See id.*

Because of the rationales supporting the doctrine, courts typically apply it only against the fund's "passive" beneficiaries, who are typically those beneficiaries not employing separate counsel to represent their own interests. *See Travelers Ins. Co.*, 541 S.W.2d at 590.[4] However, while the hiring of separate counsel can avoid application of the common fund doctrine under most circumstances, a beneficiary who hires separate counsel cannot escape application of the doctrine completely. Plainly stated, unless the separate counsel meaningfully participates in acquiring, preserving, or increasing the common fund, *see Montcastle v. Baird*, 723 S.W.2d 119, 123 (Tenn.Ct.App.1986), the beneficiary may be obliged to pay fees to the original or lead counsel in addition to those fees payable to the separate counsel. These circumstances can arise when (1) the original or lead counsel was responsible for the "lion's share" of work in acquiring, preserving, or increasing the common fund, *Hobson*, 801 S.W.2d at 809; (2) the work of separate counsel inured only to the benefit of a single beneficiary, and not to the fund itself, *Gilpin v. Burrage*, 188 Tenn. 80, 90, 216 S.W.2d 732, 737 (1948); *Merchants & Planters Bank v. Myers*, 644 S.W.2d 683, 688 (Tenn.Ct.App.1982); or (3) the separate counsel was hired expressly to advocate interests contrary to those of the common fund.[5]

---

**4.** *See also Ensley v. Ensley*, 105 Tenn. 107, 136, 58 S.W. 288, 294 (1900) ("[I]nasmuch as the parties other than complainants have also to employ counsel to represent their interests, and they incur fees, it would not be equitable or proper to pay counsel fees representing one interest, and not to pay others as vitally, if not so extensively, interested."); *see also Travelers Ins. Co.*, 541 S.W.2d at 590 (stating that the common fund doctrine is not "applied against persons who have employed counsel on their own account to represent their interests").

**5.** *See In re McCrary*, No. 87–128–II, 1987 WL 11898 (Tenn.Ct.App. filed at Knoxville, June 9, 1987). In this case, an heir to an estate hired counsel to keep certain property out the estate so that he could use the property for his own personal benefit. The Court of Appeals held that "a beneficiary who retains counsel to thwart efforts to marshal assets of the estate is certainly in no better position than a passive beneficiary and should have to bear his or her share of the attorney's fees [under the common fund doctrine] which were incurred to augment or preserve the estate."

With this general background in mind, therefore, we turn to the two issues presented in this case: (1) whether the common fund doctrine may be applied to the proceeds of a wrongful death action generally; and (2) whether the children in this case, who hired separate counsel to protect their interests, are nevertheless required to pay an equitable share of the appellant's attorneys' fees.[6] Importantly, if the common fund doctrine does not apply here, or if the children are held not to be passive beneficiaries to the action, then the appellant's attorney must seek compensation from his client alone, and he may not recover any additional fees from the children's share of the settlement.

## GENERAL APPLICATION OF THE COMMON FUND DOCTRINE TO THE PROCEEDS OF A WRONGFUL DEATH ACTION

No case from this Court has expressly recognized that the common fund doctrine may be applied to the proceeds of a wrongful death action, although the Court of Appeals has done so in at least three unreported cases.[7] However, the common law does not prevent the doctrine from being applied in such an action, as the doctrine can be "applie[d] generally to all funds [that are] created, increased[,] or preserved by a party in which others have an ownership interest." *Scholtens v. Schneider*, 173 Ill.2d 375, 219 Ill.Dec. 490, 671 N.E.2d 657,

663 (1996); *see also Edwards v. Alaska Pulp Corp.*, 920 P.2d 751, 755 (Alaska 1996) ("The common fund doctrine is implicated any time one litigant's success releases well-defined benefits for a limited and identifiable group."). In fact, the only restriction against applying the doctrine in Tennessee is that attorneys' fees may not be taken from a portion of the fund that is subject to a lien or other interest superior to that of the common beneficiaries. *See Bird v. Collette*, 26 Tenn.App. 181, 185, 168 S.W.2d 797, 799 (1942).

Nevertheless, even when a common fund has been created, application of the common fund doctrine to spread attorneys' fees among the fund's beneficiaries may not always be advisable. The United States Supreme Court has recognized that application of the doctrine is warranted only when the number of beneficiaries is relatively small and their identities are easily discovered; when the benefits accruing to each beneficiary can be determined with some accuracy; and when the attorneys' fees can "be shifted with some exactitude to those benefiting." *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 265 n. 39, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Several other states have also used these considerations to decide whether application of the common fund doctrine would be proper in any given case.[8]

---

**6.** The children do not argue in this Court that their own attorneys are entitled to compensation from the common fund created by the settlement. Instead, they maintain only that they should not be required to pay for the legal services of the appellant's attorney, with whom they had no contract.

**7.** *See Wheeler v. Burley*, No. 01A01–9701–CV–00006, 1997 WL 528801 (Tenn.Ct.App. filed at Nashville, Aug. 27, 1997), *perm. to appeal*

denied, Apr. 13, 1998; *see also PST Vans, Inc. v. Reed*, No. E1999–01963–COA–R3–CV, 1999 WL 1273517 (Tenn.Ct.App. Dec. 28, 1999); *In re Stout*, No. 01A01–9308–CH–00360, 1994 WL 287765 (Tenn.Ct.App. filed at Nashville, June 29, 1994).

**8.** *See, e.g., Alaska Pulp Corp.*, 920 P.2d at 756 n. 9; *Community Care Ctrs., Inc. v. Indiana Family & Soc. Servs. Admin.*, 716 N.E.2d 519, 547 (Ind.Ct.App.1999); *Wisconsin Retired*

We conclude that application of the common fund doctrine in the wrongful death context will rarely be inappropriate. Undeniably, a party's successful efforts in bringing a wrongful death suit result in creating a fund in which multiple parties may claim an ownership interest. These beneficiaries stand on equal footing as claimants against the fund, with no interest in the proceeds being subordinate or superior to another.[9] Moreover, the beneficiaries of wrongful death proceeds are usually small in number, and their identities are virtually always known. Finally, a court can accurately determine the respective shares of the fund accruing to each beneficiary, and it can spread a proportionate share of attorneys' fees to each beneficiary "with some exactitude." Accordingly, we hold that a trial court may, in its discretion, apply the common fund doctrine in a successful wrongful death action, thereby requiring the passive beneficiaries to pay a reasonable attorneys' fee to the party bringing the action.

*Kline*, 69 S.W.3d at 204–06.

■ In the present case, Mother's testimony is somewhat confusing. She first testified that she hired her own attorney shortly after her daughter died. Mother later acknowledged, however, that she was told that she did not need a lawyer. Regardless of whether Mother actually hired a lawyer, the proof establishes that neither Mother nor her attorney, assuming she had one, were actively involved in the

prosecution of this lawsuit or the negotiation and settlement process. Therefore, the Trial Court properly determined that Mother was a "passive" beneficiary. *See Kline*, 69 S.W.3d at 204 ("courts typically apply [the common fund doctrine] . . . only against the fund's 'passive' beneficiaries, who are typically those beneficiaries not employing separate counsel to represent their own interests."). In addition, there is no doubt that the number of beneficiaries of the fund created in this case is "relatively small," consisting of just two members. *Id.* at 205–06. Here, Crabtree "succeeded in securing, augmenting, or preserving property or a fund of money in which [another person]", i.e., Mother is "entitled to share in common." *Id.* at 204 (quoting *Travelers Ins. Co. v. Williams*, 541 S.W.2d 587, 589–90 (Tenn.1976)). The Court in *Kline* recognized that a trial court's "application of the common fund doctrine in the wrongful death context will rarely be inappropriate." *Id.* at 206. This is not one of those rare cases. Based on the foregoing, we conclude that the Trial Court did not err in applying the common fund doctrine in this case.

■ The next issue is whether the Trial Court erred when it concluded that Crabtree was entitled to one-third of Mother's settlement proceeds as payment for Crabtree's legal services. As noted in *Kline*, we review the Trial Court's decision on this issue under an abuse of discretion standard. *Kline*, 69 S.W.3d at 203–204. As this Court stated in *DeLapp v. Pratt:*

---

*Teachers Ass'n, Inc. v. Employe Trust Funds Bd.*, 207 Wis.2d 1, 558 N.W.2d 83, 98 (1997).

9. As we discuss below, the surviving spouse has a statutory priority to assert a wrongful death action, but this statutory priority obviously does not "control the disposition of a recovery of damages for wrongful death" or otherwise affect the legal interests of the ben-

eficiaries in the fund itself. *See Gilliam ex rel. Gilliam v. Calcott*, [No. E1999–02365–COA–R3–CV, 2000 WL 336503 (Tenn.Ct.App. Mar. 30, 2000)] . . . . Because the claims against the fund, therefore, all stand on equal footing with respect to each other, application of the common fund doctrine under these circumstances is appropriate.

Our Supreme Court discussed the abuse of discretion standard in *Eldridge v. Eldridge,* stating:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge,* 42 S.W.3d 82, 85 (Tenn.2001) (citations omitted).

Appellate courts ordinarily permit discretionary decisions to stand when reasonable judicial minds can differ concerning their soundness. *Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 709 (Tenn. Ct.App.1999). A trial court's discretionary decision must take into account applicable law and be consistent with the facts before the court. *Id.* When reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Id.*

*DeLapp v. Pratt,* 152 S.W.3d 530, 538 (Tenn.Ct.App.2004).

In *Kline,* after determining that the common fund doctrine could be applied to wrongful death cases, the Supreme Court discussed the appropriate attorney fee to be paid by a passive beneficiary. The Court determined that while the fee agreement between the attorney and the lead or original plaintiff was relevant, it was not determinative. The *Kline* Court then stated:

> [T]rial courts should base any fee award from these beneficiaries upon the reasonable value of the attorney's services provided to them. *Accord In re Polybutylene Plumbing Litig.,* 23 S.W.3d 428, 438 (Tex.App.2000) ("An attorney's compensation from *noncontracting* plaintiffs under the common fund doctrine is limited to the reasonable value of the attorney's services benefitting them." (emphasis in original)). In determining a reasonable fee amount, the trial court should look to the guidelines outlined in *Connors v. Connors,* 594 S.W.2d 672, 677 (Tenn.1980) and to the factors listed in Tennessee Supreme Court Rule 8, DR 2–106.

*Kline,* 69 S.W.3d at 209. The *Kline* Court noted the applicable factors from *Connors* and Supreme Court Rule 8, DR 2–106 to be as follows:

> The *Connors* guidelines include the time devoted to performing the legal service; the time limitations imposed by the circumstances; the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly; the fee customarily charged in the locality for similar legal services; the amount involved and the results obtained; and the experience, reputation, and ability of the lawyer performing the legal service. *See* 594 S.W.2d at 676.
>
> Tennessee Supreme Court Rule 8, DR 2–106(B) contains similar, though not identical, factors, including (1) "The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly"; (2) "The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer"; (3) "The fee customarily charged in the locality for similar legal services";

(4) "The amount involved and the results obtained"; (5) "The time limitations imposed by the client or by the circumstances"; (6) "The nature and length of the professional relationship with the client"; (7) "The experience, reputation, and ability of the lawyer or lawyers performing the services"; and (8) "Whether the fee is fixed or contingent." *Kline*, 69 S.W.3d at 209 n. 11.[10]

 The Trial Court was confronted with opinions from four well-respected and experienced attorneys, in addition to the testimony of Crabtree. Crabtree and two attorneys opined that a one-third fee was reasonable in this specific case and why they believed it to be reasonable. The other two attorneys stated their opinions that a one-third fee was not reasonable and why they reached that conclusion. In its decision, the Trial Court acknowledged that Father's having entered into a one-third contingency fee arrangement with Crabtree was entitled to little weight when ascertaining what attorney fee was reasonable for Mother to pay. The Trial Court ultimately concluded that the settlement was a good settlement for both Mother and Father and a good result on their behalf was obtained. The Trial Court further emphasized the reason that Crabtree sought such a quick settlement, i.e., trying to settle before the drug test results were released.

Although there was considerable proof submitted on both sides of this issue, when considering the proof that was submitted in support of Crabtree's claim that a one-third fee was appropriate for Mother to pay, we cannot conclude that the Trial Court's ultimate decision was unreasonable. At the very least, reasonable minds could differ, as did the four experienced attorneys whose conflicting opinions were

submitted for consideration by the Trial Court. The issue is not whether we agree with the Trial Court's ultimate conclusion. The issue is whether the Trial Court abused its discretion, and we conclude that it did not.

### Conclusion

The judgment of the Trial Court is affirmed and this cause is remanded to the Circuit Court for McMinn County solely for collection of the costs below. Costs on appeal are taxed to the Appellant, Rosanna Vestal, and her surety, for which execution may issue if necessary.

---

10. The factors contained in Tennessee Supreme Court Rule 8, DR 2–106(B) are now contained in Tennessee Supreme Court Rule 8, RPC 1.5 and remain unchanged.