IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 26, 2016 Session

## AQUA-CHEM, INC. v. D&H MACHINE SERVICE, INC.

**Appeal from the Circuit Court for Knox County**
**No. 1-306-14      Kristi M. Davis, Judge**

_____

**No. E2015-01818-COA-R3-CV-FILED-OCTOBER 17, 2016**

_____

Aqua-Chem, Inc. contracted with D&H Machine Service, Inc. for D&H to machine three large, identical pieces of equipment. The piece of equipment is referred to in the record as a "cooler."[1] The work was not done properly, rendering them unusable. Aqua-Chem sued D&H for breach of contract, seeking damages for the replacement cost of the coolers and for lost profits. Aqua-Chem also sought attorney's fees and expenses pursuant to the terms of its agreement with D&H. Following a two-day bench trial, the court awarded Aqua-Chem $191,870 in replacement costs, but declined to make an award for lost profits. The court did award Aqua-Chem $50,000 in attorney's fees and out-of-pocket expenses. D&H appeals. Both sides raise issues. D&H argues that the trial court erred when it held that the terms and conditions of the purchase orders presented to D&H were applicable to the facts of this case. It also argues that the award of damages is not supported by the evidence. Aqua-Chem contends that the trial court erred in refusing to award damages for lost profits. It also asserts that the trial court should have awarded it the full amount of its fees and expenses, the total of which was $64,739.48. We affirm the trial court's judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

John B. Dupree, Knoxville, Tennessee, for the appellant, D&H Machine Service, Inc.

W. Edward Shipe and Nicholas W. Diegel, Knoxville, Tennessee, for the appellee, Aqua-Chem, Inc.

---

[1] "Cooler" is shorthand for "titanium lube oil cooler." It is a part of the compulsion system on Navy destroyers. A cooler uses sea water flowing through it to reduce the temperature of oil and reduction gears used in propelling the ship.

# OPINION

## I.

Aqua-Chem was contractually obligated to the United States Navy to provide certain parts for use on destroyers. The contract extended to the three coolers at issue in this case. The coolers had to be machined, a function that Aqua-Chem was not able to do in-house. It contracted with D&H to perform the required machining. After some discussion and D&H's confirmation that it could perform the work, Aqua-Chem provided three purchase orders to D&H, all of which state the following pertinent terms and conditions:

> For the purposes of these Terms and Conditions of Purchase, the term "Purchase Order" shall mean the agreement and binding contract between Aqua-Chem . . . and Seller arising as a result of Seller's submission of a fully executed acknowledgment copy of the purchase order. This Purchase Order shall be deemed to Incorporate and be governed by these Terms and Conditions. *Seller shall be bound by this Purchase Order and its terms and conditions* when it executes and returns the acknowledgment copy, when it otherwise indicates its acceptance of this Purchase Order, *when it delivers to Aqua-Chem any of the items ordered herein or when it renders for Aqua-Chem any of the services ordered herein*. THE TERMS AND CONDITIONS OF THIS PURCHASE ORDER TAKE PRECEDENCE OVER ANY TERMS AND CONDITIONS WHICH ARE PROPOSED BY SELLER. ALL TERMS PROPOSED BY SELLER ARE REJECTED UNLESS EXPRESSLY ASSENTED TO IN WRITING BY AQUA-CHEM. Aqua-Chem's failure to object to any provision contained in any communication from Seller shall not be construed as a waiver of these Terms and Conditions nor as an acceptance of any such provision.

*     *     *

2

SERVICES & DELIVERABLES.  Seller agrees to perform the services . . . described in any purchase order, in accordance with the applicable purchase order, scope of work and with these Terms and Conditions ("Agreement").  *Upon acceptance of a purchase order*, shipment of Goods *or commencement of a Service, Seller shall be bound by the provisions of this Agreement, including all provisions set forth on the face of any applicable purchase order, whether Seller acknowledges or otherwise signs this Agreement or the purchase order, unless Seller objects to such terms in writing prior to shipping Goods or commencing Services.*

\*    \*    \*

MODIFICATION OF TERMS.  This Purchase Order is expressly subject to, and Seller's acceptance is expressly conditioned upon, Seller's assent to each and all of the terms and conditions contained on the face end reverse side hereof. No addition to or modification of the terms and conditions hereof shall be binding upon Aqua-Chem. . . .  Where Seller's quotation, acknowledgement, invoice or other correspondence contains terms or conditions contrary to or in addition to Aqua-Chem's terms and conditions, such contrary or additional terms are hereby refused and rejected (and without any requirement of further notice of such refusal and rejection) and neither acceptance by Aqua-Chem of the goods nor payment therefor shall constitute a waiver by Aqua-Chem of any of the terms and conditions contained herein or assent to any other conditions.

\*    \*    \*

COMPLETE AGREEMENT AND MODIFICATIONS.  This contract constitutes the entire agreement between the parties relating to the Services and any products produced in connection with the Services and *no addition to or modification of any provision of said agreement shall be binding upon Aqua-Chem unless agreed in writing by Aqua-Chem.*

(Capitalization in original; emphasis added.)

3

No one from D&H signed the purchase orders. However, it is undisputed that D&H picked up the coolers, machined them, and sent them back to Aqua-Chem. It is also undisputed that the work was incorrectly done, which rendered the coolers unusable.

Aqua-Chem filed a complaint for breach of contract. D&H answered and filed a counterclaim, later amended, in which it alleged that D&H had orally rejected the terms and conditions of the purchase orders in a telephone call between representatives of the parties. D&H alleged that it orally agreed to machine the coolers, but disputed it was to be on the terms and conditions in the purchase orders.

Aqua-Chem moved for partial dismissal of the counterclaim, arguing that the clear and unambiguous terms of the purchase orders provided for acceptance by performance, and precluded any oral modification or selective rejection of the terms and conditions. The trial court granted the motion in an order, which stated:

> [T]his Court . . . finds that [Aqua-Chem's] terms and conditions, which were either directly attached or incorporated by reference into each purchase order, apply to all transactions at issue in this case. Therefore, the Court finds that [D&H] performed the work at issue for [Aqua-Chem] subject to all of the terms and conditions, including the contractual limitation of liability clause limiting any potential recovery to the purchase price.

A bench trial followed. Three witnesses testified: two representatives from Aqua-Chem and one from D&H. The trial court rejected D&H's allegation that the plans provided by Aqua-Chem for the machining work were incorrect or unclear, noting that

> the plans are approximately 18 years old and that they are a result of considerable testing that had to be approved by the Navy. They have been used apparently for 19 years.

The court found "no evidence . . . of there being any problems with implementation of the plans." The trial court held that "it was ultimately incumbent upon D&H to ensure that they did machine the coolers correctly and that its failure to do so is a breach of the contract." It awarded Aqua-Chem $191,870 – the cost of replacing the three coolers according to the evidence presented by Aqua-Chem.

At trial, Aqua-Chem's vice-president of quality, David Hansard, testified briefly regarding its claim for the profits lost as a result of the breach of contract. He said Aqua-

Chem's accounting department provided him with numbers showing 730.35 labor hours spent by Aqua-Chem employees that would have not been necessary absent D&H's breach of contract. Hansard estimated that Aqua-Chem's profit margin on labor was $25.96 per hour, resulting in a lost profit claim totaling $18,960. No one from Aqua-Chem's accounting department testified. Hansard stated that "our CFO calculated this for me, and I do not know the exact method that he used." Because Aqua-Chem provided no other proof regarding the basis or method of computing its lost profits, the trial court held that the evidence of lost profits was not sufficient to justify an award. Accordingly, the court denied Aqua-Chem's claim for lost profits.

Aqua-Chem also submitted a claim for attorney's fees in the amount of $64,739.48. The trial court held that Aqua-Chem was entitled to attorney's fees under the contract and found that fees in the amount of $50,000 were reasonable and necessary under the circumstances. D&H timely filed a notice of appeal.

## II.

D&H raises the following issues:

> Whether the trial court erred in holding that the terms and conditions of the purchase orders were applicable when the written offer to D&H was rejected and Aqua-Chem never sued upon any alleged oral agreement or sought property damages.

> Whether the trial court erred by awarding Aqua-Chem damages when Aqua-Chem failed to mitigate and when the damages sought by Aqua-Chem were too speculative to support an award.

Aqua-Chem raises these issues:

> Whether the trial court erred by not awarding Aqua-Chem its lost profits based upon profit margin records provided to Aqua-Chem's executive witness by its accounting department and where the proof was admitted into evidence at trial without objection.

> Whether the trial court erred in granting Aqua-Chem attorney's fees in the amount of $50,000 instead of the full amount of $64,739.48 requested.

5

Whether Aqua-Chem is entitled to attorney's fees on appeal.

## III.

In this non-jury case, our standard of review is de novo upon the record of the proceedings below; however, the record comes to us with a presumption of correctness as to the trial court's factual determinations, a presumption we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); ***Wright v. City of Knoxville***, 898 S.W.2d 177, 181 (Tenn. 1995). There is no presumption of correctness as to the trial court's legal conclusions. ***Kendrick v. Shoemake***, 90 S.W.3d 566, 569 (Tenn. 2002); ***Campbell v. Fla. Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996).

## IV.

## A.

D&H argues that the trial court erred in granting Aqua-Chem's Tenn. R. Civ. P. 12.02(6) motion to partially dismiss the counterclaim for failure to state a claim upon which relief can be granted. Our standard of review is as stated by the Supreme Court:

> A Rule 12.02(6) motion challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence. The resolution of a 12.02(6) motion to dismiss is determined by an examination of the pleadings alone. A defendant who files a motion to dismiss admits the truth of all of the relevant and material allegations contained in the complaint, but asserts that the allegations fail to establish a cause of action.

> In considering a motion to dismiss, courts must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences. A trial court should grant a motion to dismiss only when it appears that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief. We review the trial court's legal conclusions regarding the adequacy of the complaint de novo.

6

***Webb v. Nashville Area Habitat for Humanity, Inc.***, 346 S.W.3d 422, 426 (Tenn. 2011) (internal citations, quotation marks and ellipsis omitted).

D&H's amended counterclaim alleges:

> [O]n or about March 4, [2014,] Aqua-Chem emailed its first purchase order to [D&H] along with engineering plans. Shortly after the email was sent, Aqua-Chem's purchasing agent, Greg Cagle, called Brian Hillard at [D&H] and requested that Mr. Hillard sign the purchase order and return it to Aqua-Chem. Mr. Hillard advised Mr. Cagle that he would not sign the purchase order because he could not accept responsibility for the value of the part and did not agree with the terms and conditions. Mr. Hillard also advised Mr. Cagle that [D&H] could do the machining, but would not accept the terms and conditions on the purchase order. Mr. Cagle then acquiesced and advised Mr. Hillard to come to Aqua-Chem to pick up the parts. [D&H] then picked up the parts and performed the machining never having signed the purchase order and never having agreed to the additional onerous terms and conditions of any of the purchase orders.

Contrary to D&H's allegations, the trial court held that the terms and conditions were applicable because D&H accepted them by performance. The court stated as follows:

> I want to clarify for the record that . . . my interpretation of this agreement is that an acceptance of the terms can occur by performance. And that is what happened in this case, is that by performing the work as requested in the purchase order, that D&H did accept and is bound by the terms and conditions contained within that contract.

It is undisputed that D&H received and read, or had an opportunity to read, the terms and conditions of the purchase orders. Each of them provides that "[D&H] shall be bound by this Purchase Order and its terms and conditions . . . when it renders for Aqua-Chem any of the services ordered herein." The terms and conditions also state that, "[u]pon . . . commencement of a Service, [D&H] shall be bound by the provisions of this Agreement, . . . whether [D&H] acknowledges or otherwise signs this Agreement or the purchase order, *unless* [*D&H*] *objects to such terms in writing prior to . . . commencing Services.*" (Emphasis added.)

7

Regarding the concept of acceptance by performance, this Court has observed,

> Assent to a contract need not take the form of words, but may instead be "manifested, in whole or in part, by the parties' spoken words or by their actions or inactions." **Burton v. Warren Farmers Co-op.**, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002) (citations omitted). "[I]n some instances performance or even preparation for performance may suffice" to give notice of acceptance by a promise. 1 Farnsworth, [*Farnsworth on Contracts*,] § 3.15, at 300 [3d ed. 2004]; *see Restatement (Second) of Contracts* § 19(1)-(2) (1981) (stating that assent may be made by acts other than words so long as the party "intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents"). Whether an action constitutes an acceptance must be assessed in terms of whether it "would lead a reasonable person to conclude that the offer has been accepted." **Overman v. Brown,** 372 N.W.2d 102, 105 (Neb. 1985) (citing **In re Mapes Enterprises, Inc.,** 15 B.R. 192 (D. Nev. 1981)). It must be noted, though, that mutuality of assent may not be inferred from a party's unilateral actions, from an ambiguous course of dealing, or "solely [from] the uncommunicated intentions or states of mind of the contracting parties." **Burton**, 129 S.W .3d at 521 (citations omitted); see **Balderacchi v. Ruth**, 256 S.W.2d 390, 391 (Tenn. Ct. App. 1953).

*   *   *

> Acting in a manner that indicates acceptance of a contract is generally deemed to be acceptance – at least in the absence of a requirement that the acceptance take a different form. Unless the other party has reason to know of it, contract law does not typically credit a claim that, in spite of a party's objective manifestations of assent, it subjectively did not intend to be bound.

*Rode Oil Co. v. Lamar Adver. Co.*, No. W2007-02017-COA-R3-CV, 2008 WL 4367300, at *8-9 (Tenn. Ct. App., filed Sept. 18, 2008).

Here, construing the counterclaim liberally, presuming all its factual allegations to be true, and giving D&H the benefit of all reasonable inferences, it is undisputed that D&H picked up the coolers, performed machining work on them, and returned them. In addition, it is undisputed that all of this occurred without a written objection to any of the terms and conditions. Furthermore, and as previously noted, the terms and conditions expressly preclude any oral modification of the agreement, stating:

> The terms and conditions of this purchase order take precedence over any terms and conditions which are proposed by [D&H]. All terms proposed by [D&H] are rejected unless expressly assented to in writing by Aqua-Chem.
>
> This Purchase Order is expressly subject to, and [D&H's] acceptance is expressly conditioned upon, [D&H's] assent to each and all of the terms and conditions[.]
>
> This Purchase Order supersedes completely any oral or written communications unless the terms are expressly incorporated herein.
>
> No addition or modification of the terms and conditions hereof shall be binding upon Aqua-Chem[.]
>
> Where [D&H's] quotation, acknowledgement, invoice or other correspondence contains terms or conditions contrary to or in addition to Aqua-Chem's terms and conditions, such contrary or additional terms are hereby refused and rejected[.]
>
> This contract constitutes the entire agreement between the parties relating to the Services . . . and no addition to or modification of any provision of said agreement shall be binding upon Aqua-Chem unless agreed in writing by Aqua-Chem.

(Capitalization in original omitted.) We agree with and affirm the trial court's determination that the undisputed pertinent facts establish, as a matter of law, that the terms and conditions of the purchase orders were part of the parties' agreement and, hence, applicable to the facts of this case.

The trial court allowed D&H to make an offer of proof at trial regarding its contention that the parties had orally agreed that the terms and conditions would not apply. D&H employee Brian Hillard testified that he spoke with Aqua-Chem representative Greg Cagle on the telephone and told him that "he did not agree to those terms and conditions," and "his response was when I could [*sic*] have the [coolers] machined and to come and pick them up." The trial court, after hearing this proffer, reaffirmed its ruling that the written terms and conditions to the purchase orders were applicable. This ruling constitutes an implicit rejection of D&H's argument that the proof established a distinct oral agreement, the terms of which differed from the written contract.

**B.**

D&H argues that "Aqua-Chem failed to prove its damages with reasonable certainty" and "it was impossible to make a fair and reasonable assessment of the damages because Aqua-Chem failed to mitigate its damages." At trial, Aqua-Chem executive Hansard testified that Aqua-Chem incurred replacement cost damages in the total amount of $191,870, the amount found and awarded by the trial court. D&H did not object to this proof, nor did it introduce countervailing evidence suggesting that this number was inaccurate or inflated. The evidence does not preponderate against the trial court's determination of replacement cost damages.

**C.**

"Under the doctrine of mitigation of damages, an injured party is enlisted with a duty to exercise reasonable care and due diligence to avoid loss or minimize damages after suffering injury." ***JWT, L.P. v. Printers Press, Inc.***, No. M2001-02590-COA-R3-CV, 2002 WL 31397317, at *5 (Tenn. Ct. App., filed Oct. 24, 2002). Mitigation of damages is an affirmative defense. ***Maness v. Collins***, No. W2008-00941-COA-R3-CV, 2010 WL 4629614, at *11 (Tenn. Ct. App., filed Nov. 17, 2010) ("The failure to mitigate damages is an affirmative defense"); ***Allied Waste N. Amer., Inc. v. Lewis, King, Krieg & Waldrop, P.C.***, 93 F. Supp. 3d 835, 863 (M.D. Tenn. 2015) ("the failure to mitigate damages is an affirmative defense under Tennessee law") (internal quotation marks omitted). Therefore, mitigation must be pleaded under Tenn. R. Civ. P. 8.03, or else it is waived under Tenn. R. Civ. P 12.08 ("A party waives all defenses and objections which the party does not present either by motion . . . or . . . in the party's answer or reply, or any amendments thereto."). *See* ***Vintage Health Res., Inc. v. Guiangan***, 309 S.W.3d 448, 460 (Tenn. Ct. App. 2009). In this case, D&H did not plead the failure to mitigate

damages in any pleading filed with the trial court. Accordingly, D&H's mitigation of damages defense has been waived.[2]

## D.

Aqua-Chem argues that the trial court erred by declining to award damages for lost profits resulting from the breach of contract. This Court set forth the principles governing a claim for lost profits in *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 58-59 (Tenn. Ct. App. 2004), stating as follows:

> [A]n injured party may recover lost anticipated profits when their nature and occurrence have been established with reasonable certainty. *Baker v. Hooper*, 50 S.W.3d 463, 470 (Tenn. Ct. App. 2001); *Tire Shredders, Inc. v. ERM–North Cent., Inc.*, 15 S.W.3d 849, 857 (Tenn. Ct. App. 1999); 1 RECOVERY OF DAMAGES FOR LOST PROFITS § 1.4, at 9.
>
> The reasonable certainty standard applies chiefly to the evidence regarding the existence of damages. 1 RECOVERY OF DAMAGES FOR LOST PROFITS § 1.6, at 17. It is a flexible standard that permits the courts to take the particular facts of each case into consideration. The existence of damages has been proven with reasonable certainty when the mind of a

---

[2] Even if it had not been waived, or to the extent it could be argued that the issue was tried by implied consent – an argument not made by D&H – it has failed to prove that Aqua-Chem did not exercise reasonable care and due diligence to avoid further loss or minimize its damages. "The burden is on the defendants who breached the contract to prove what amounts should be offset in mitigation of damages." *State ex rel. Chapdelaine v. Torrence*, 532 S.W.2d 542, 550 (Tenn. 1975), *abrogation on other grounds recognized by Wells v. Tenn. Bd. of Regents*, 231 S.W.3d 912, 916-17 (Tenn. 2007); *accord ABC Painting Co. v. White Oaks Apts. of Hermitage*, No. M2006-00280-COA-R3-CV, 2007 WL 14250, at *3 (Tenn. Ct. App., filed Jan 2, 2007). David Ferris, Aqua-Chem's manufacturing engineer over military products, testified that the incorrectly-machined coolers were not salvageable or repairable, stating, "I don't see a way possible that these could ever be used." He also explained that the design for the coolers "is a Navy design. You can't sell it to anybody else anyway. They own the design." The plans and designs for this important part for Navy warships are not publicly available information and were placed under seal by the trial court. D&H's argument that Aqua-Chem should not recover because it did not mitigate its damages is without merit.

prudently impartial person is satisfied that the injured party has been damaged.

Once an injured party proves that it has been damaged, the amount of the damages need not be proved with certainty or mathematical precision. ***McClain v. Kimbrough Constr. Co.***, 806 S.W.2d 194, 200 (Tenn. Ct. App. 1990); *see also* ***Authentic Architectural Millworks, Inc. v. SCM Group USA, Inc.***, 262 Ga. App. 826, 586 S.E.2d 726, 731 (2003). After the fact of damages ha[s] been established, less certainty is required with regard to the amount of the damages. The amount of lost profits damages may be based on estimates. While definite proof regarding the amount of damages is desirable as far as it is reasonably possible, it is even more desirable that an injured party not be deprived of compensation merely because it cannot prove the extent of the harm suffered with complete certainty. Restatement (Second) of Torts § 912 cmt. a (1979). This principle is based on the policy that defendants should not be permitted to complain about the lack of exactness or precision in the proof regarding the amount of damages when their wrongdoing created the damages in the first place. ***Walgreen Co. v. Walton***, 16 Tenn. App. 213, 223, 64 S.W.2d 44, 50 (1932); 1 RECOVERY OF DAMAGES FOR LOST PROFITS § 5.2, at 385.

An award for lost profits damages depends on whether the evidence provides a satisfactory basis for estimating what the injured party's probable earnings and expenses would have been had the wrongdoing not occurred. Since lost profits can rarely be computed down to the last penny, the evidence needed to support an award for lost profits need only provide a reasonable or rational basis for calculating what the lost profits would have been.

(Footnotes and some internal citations omitted.) In ***Waggoner Motors***, 159 S.W.3d at 58 n.29, and more recently in ***Borla Performance Industries v. Universal Tool and Engineering, Inc.***, No. E2014-00192-COA-R3-CV, 2015 WL 3381293, at *8 (Tenn. Ct. App., filed May 26, 2015), we observed that "definite proof regarding the amount of damages is desirable as far as it is reasonably possible," and that "[p]arties seeking to recover lost profits damages would be well advised to provide the best available proof as to the amount of their loss that the particular situation permits."

12

Aqua-Chem executive Hansard provided the following testimony about its lost profits allegation:

> The next row is lost profit. Let me explain. We consume 730 hours of our shop labor to rebuild these three units. This is a lost opportunity for Aqua-Chem. Because we could have used those hours for other pursuits, other customers, other products. My accounting department gave me a figure of every hour. We have the ability to make $25.96 of margin. So as the math shows, we lost 730 hours, times 25.96. That's 18,960[3] hours of lost profit opportunities.
>
> &ast;  &ast;  &ast;
>
> THE COURT: I've got a quick question for you. On your damages summary, your lost profit section, that $25.96 an hour, how was that – do you know how that was calculated? Was that like an average of profit for each job?
>
> THE WITNESS: Well, our CFO calculated this for me, and I do not know the exact method that he used.
>
> THE COURT: Okay. Thank you.

(Footnote added.) In order to prevail on its claim for lost profits, Aqua-Chem had the burden to present evidence that "provides a satisfactory basis for estimating what [its] probable earnings and expenses would have been had the wrongdoing not occurred." **Borla Perf. Indus.**, 2015 WL 3381293, at *10 (quoting **Waggoner Motors**, 159 S.W.3d at 58-59). As can be seen from the above testimony, when Hansard was questioned on this very point by the trial court, he was unable to provide the basis for such a calculation. Neither the CFO nor anyone from Aqua-Chem's accounting department testified. Under these circumstances, the evidence does not preponderate against the trial court's judgment declining to award lost profits.

## E.

Aqua-Chem requested a judgment for its attorney's fees and expenses in the amount of $64,739.48. The trial court reviewed the request and supporting

---

[3] The calculation actually results in a figure of 18,951 hours.

documentation, and determined that $50,000 was a reasonable and necessary amount for fees and expenses. Aqua-Chem argues on appeal that the court should have awarded it the full amount requested. As the Supreme Court has observed,

> The trial court's determination of a reasonable attorney's fee is "a subjective judgment based on evidence and the experience of the trier of facts," **United Med. Corp. of Tenn., Inc. v. Hohenwald Bank & Trust Co.**, 703 S.W.2d 133, 137 (Tenn. 1986), and Tennessee has "no fixed mathematical rule" for determining what a reasonable fee is. **Killingsworth v. Ted Russell Ford, Inc.**, 104 S.W.3d 530, 534 (Tenn. Ct. App. 2002). Accordingly, a determination of attorney's fees is within the discretion of the trial court and will be upheld unless the trial court abuses its discretion. **Kline v. Eyrich**, 69 S.W.3d 197, 203 (Tenn. 2002); **Shamblin v. Sylvester**, 304 S.W.3d 320, 331 (Tenn. Ct. App. 2009). We presume that the trial court's discretionary decision is correct, and we consider the evidence in the light most favorable to the decision. **Henderson v. SAIA, Inc.**, 318 S.W.3d 328, 335 (Tenn. 2010); **Keisling v. Keisling**, 196 S.W.3d 703, 726 (Tenn. Ct. App. 2005). The abuse of discretion standard does not allow the appellate court to substitute its judgment for that of the trial court, **Williams v. Baptist Mem'l Hosp.**, 193 S.W.3d 545, 551 (Tenn. 2006); **Myint v. Allstate Ins. Co.**, 970 S.W.2d 920, 927 (Tenn. 1998), and we will find an abuse of discretion only if the court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party." **Konvalinka v. Chattanooga–Hamilton Cnty. Hosp. Auth.**, 249 S.W.3d 346, 358 (Tenn. 2008); *see also* **Lee Med., Inc. v. Beecher**, 312 S.W.3d 515, 524 (Tenn. 2010).

**Wright ex rel. Wright v. Wright**, 337 S.W.3d 166, 176 (Tenn. 2011).

Regarding the factors to be considered by the trial court in setting a reasonable attorney's fee, we have recently stated,

> Tennessee Supreme Court Rule 8, Rule of Professional Conduct 1.5(a) sets forth the factors to be considered in determining the reasonableness of attorney's fees, providing:

14

(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent;

(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) whether the fee agreement is in writing.

*Beacon4, LLC v. I & L Inv., LLC*, No. E2015-01298-COA-R3-CV, 2016 WL 4545736, at *40 (Tenn. Ct. App., filed Aug. 30, 2016). "[A] trial court properly may exercise its discretion and consider the applicable factors in determining a reasonable amount of attorney's fees even if an attorney's affidavit of fees fails to address all of the factors to be considered or, depending on the circumstances, even in the absence of an affidavit of attorney's fees." *Id.*

15

In this case, the trial court obviously was very familiar with the pleadings and proceedings. As already noted, there were three witnesses presented over a two-day bench trial. The issues presented and tried were not particularly complex. Based on our review of the record and applicable factors, we find no abuse of discretion by the trial court in awarding $50,000 in attorney's fees and expenses.

## F.

D&H has not appealed the trial court's determination that it is liable to Aqua-Chem for attorney's fees under the terms of the parties' agreement. Consequently, Aqua-Chem's request for attorney's fees on appeal is granted. On remand, the trial court shall hear proof and enter judgment for reasonable and necessary fees and expenses incurred by Aqua-Chem on appeal.

## V.

The judgment of the trial court is affirmed. Costs on appeal are assessed one-half to the appellant, D&H Machine Service, Inc., and one-half to the appellee, Aqua-Chem, Inc. The case is remanded for further action consistent with this opinion, and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE

16